WILLIAM M. WELCH, II
Chief, Public Integrity Section

NICHOLAS A. MARSH
EDWARD P. SULLIVAN
Trial Attorneys
Public Integrity Section
United States Department of Justice
1400 New York Ave. NW, 12th Floor
Washington, D.C. 20005
(202) 514-1412

JOSEPH W. BOTTINI
JAMES A. GOEKE
Assistant U.S. Attorneys
District of Alaska
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska 99513-7567
(907) 271-5071

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. _____ |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| BILL J. ALLEN, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

## FACTUAL BASIS FOR PLEA

At all times relevant hereto:

    1.    BILL J. ALLEN (hereinafter "ALLEN" or "Defendant") was the Chief Executive Officer and principal owner of VECO Corporation.

    2.    VECO Corporation ("VECO") was originally incorporated in 1979 as VECO International, Inc., a Delaware corporation. The name was changed to VECO Corporation in 1995. VECO was a multi-national corporation that provides services (including project

management, engineering, procurement, construction, operations and maintenance) to the energy, resource and process industries and to the public sector. VECO employed approximately 4,000 people in various projects worldwide, and was comprised at various times of the following companies: (1) VECO Alaska, Inc.; (2) VECO Construction, Inc.; (3) VECO Controls, Inc.; (4) VECO Environmental & Professional Services; (5) VECO Equipment, Inc.; (6) VECO Middle East, Inc.; (7) VECO Operations, Inc.; (8) VECO Pacific, Inc.; (9) VECO Products, Inc.; (10) VECO Properties, Inc.; (11) VECO Services, Inc.; and (12) Southwest VECO, Inc. VECO was not in the business of residential construction or remodeling.

3. RICHARD L. SMITH, also known as RICK SMITH, was the Vice President of Community and Government Affairs for VECO.

4. VECO Executive A was an executive of VECO.

5. VECO Executive B was an executive of VECO.

6. "State Representative A" is an elected member of the Alaska State House of Representatives, and has served from 1995 to the present.

7. "State Representative B" was, from 1992 to 2006, an elected member of the Alaska State House of Representatives.

8. "State Representative C" was, from 2002 to 2006, an elected member of the Alaska State House of Representatives.

9. "State Senator A" is an elected member of the Alaska State Senate. State Senator A was first elected to the Alaska State Senate in 2000.

10. "State Senator B" was, from 2001 to 2006, a member of the Alaska State Senate.

-2-

### A. State Representative A

11. From on or about January 1, 2006, to on or about August 30, 2006, ALLEN corruptly provided at least three separate cash payments to State Representative A: (1) a cash payment of $1,000, given to State Representative A by ALLEN at the Island Pub, a restaurant in Juneau, Alaska, at a dinner meeting at which SMITH also attended; (2) two separate cash payments totaling approximately $600 to $1,100, given by ALLEN and SMITH to State Representative A in a hotel room at a hotel in Juneau, Alaska; and (3) a cash payment of approximately $500, made by ALLEN to State Representative A in Juneau, Alaska.

12. After these payments, State Representative A offered to take official actions and use his official position to support particular pieces of legislation requested by ALLEN and SMITH. For instance, and without limitation, on or about March 30, 2006, immediately after receiving the second of the two cash payments in the hotel suite described above, State Representative A asked ALLEN and SMITH what State Representative A could do "for you guys," ALLEN said that the passage of the oil tax and gas pipeline legislation was important to them. State Representative A thereafter agreed to lobby his colleagues in the Alaska State Legislature to support the legislation favored by VECO.

### B. State Representative B

13. From on or about January 1, 2006, to on or about August 30, 2006, ALLEN corruptly provided multiple financial benefits to State Representative B. For instance, on or about June 1, 2006, in a hotel room located in Juneau, Alaska, ALLEN gave State Representative B a cash payment of approximately $1,000. ALLEN intended the $1,000 payment to reimburse State Representative B for a contribution in that amount given by State Representative B to an

-3-

Alaskan gubernatorial campaign. There had been no previous agreement on reimbursement of the contribution with State Representative B.

14. In or about July and August 2006, State Representative B asked for, and ALLEN and SMITH agreed to provide, additional funds to State Representative B. Accordingly, on or about July 31, 2006, SMITH provided, at State Representative B's request, approximately $7,993 to State Representative B through an inflated invoice prepared by a private business owned by State Representative B. State Representative B referred to this scheme as "foolproof." The check given to State Representative B was drawn on ALLEN's personal checking account.

15. From in or about September 2005 to on or about August 30, 2006, ALLEN and SMITH discussed with State Representative B multiple times the possibility that State Representative B would obtain post-legislative work, as a lobbyist or otherwise with VECO or with VECO's assistance. In one of these conversations, State Representative B told ALLEN and SMITH, "You'll get your pipeline . . . and I'll get my job . . . ."

16. From in or about September 2005 to on or about August 30, 2006, ALLEN and SMITH asked State Representative B on multiple occasions to assist VECO's political and business objectives by taking official actions and by using State Representative B's official position as a member of the Alaska State Legislature. For instance, and without limitation, on or about May 7, 2006, State Representative B was on the floor of the Alaska State House of Representatives in Juneau, Alaska, during a vote on a particular piece of legislation. ALLEN and SMITH contacted State Representative B on State Representative B's cellular telephone, and gave State Representative B instructions on how to vote on the particular piece of legislation. Thereafter, State Representative B called ALLEN and SMITH - again, from the floor of the

-4-

Alaska State House of Representatives - and gave information to ALLEN and SMITH concerning the status of the vote and the projected outcome. Later that evening, in a meeting between ALLEN, SMITH, and State Representative B in a hotel room in Juneau, Alaska, State Representative B told ALLEN and SMITH that State Representative B's vote on that particular piece of legislation was directly the result of ALLEN and SMITH's request.

### C. State Representative C

17. In or about late April or early May 2006, State Representative C, a lawyer in private practice, sent a letter to VECO, addressed to ALLEN, seeking paid legal work with VECO at the conclusion of the 2006 legislative session. ALLEN believed that State Representative C's solicitation of legal work was actually an offer by State Representative C to corruptly solicit work from VECO in exchange for State Representative C's agreement to take official acts to further VECO's political objectives.

18. From in or about May 2006 to on or about August 30, 2006, ALLEN told State Representative C that ALLEN would discuss providing VECO legal work with VECO's legal counsel after the end of the 2006 legislative session. ALLEN believed that both he and State Representative C understood that, in return, State Representative C needed to support certain legislation favored by VECO that was pending before the House of Representatives.

19. State Representative C did in fact support the legislation VECO favored, and ALLEN believed that State Representative C did so because State Representative C believed VECO would provide him with legal work in exchange for the support. As of August 30, 2006, however, VECO had not provided State Representative C with any legal work.

-5-

### D. State Senator A

20. On or about June 24, 2006, State Senator A called ALLEN and told him that State Senator A had spoken with SMITH earlier in the week, and that State Senator A had come up with an idea to provide a state elected official with funds in exchange for the state elected official's support on legislation. Specifically, State Senator A told ALLEN that the state elected official wanted "money." State Senator A told the state elected official that VECO could "probably get some money" to the state elected official, but that the state elected official would have to make a 'commitment' to support certain legislation. According to State Senator A, the state elected official agreed, and wanted to meet with ALLEN to discuss the matter.

21. On or about June 25, 2006, ALLEN met with State Senator A and the state elected official at a restaurant in Anchorage, Alaska. In that meeting, State Senator A told the state elected official that VECO, through ALLEN, was willing to raise campaign funds for the state elected official's campaign in exchange for voting "the way me and [State Senator B] were to vote" on particular legislation. When the state elected official asked how much campaign funds ALLEN could provide, ALLEN said he could probably raise and provide $25,000. The state elected official indicated that this amount of money would be sufficient, but that the state elected official needed to make sure he was willing to support the particular legislation VECO favored.

22. Between in or about June 2006 and on or about August 30, 2006, ALLEN did not have any further conversations with the state elected official concerning the payment, and VECO did not raise or provide campaign contributions for the state elected official, nor did ALLEN, SMITH or anyone at VECO host a fundraiser for the state elected official.

### E. State Senator B

23.     From in or about 1995 until in or about 2001, ALLEN corruptly authorized VECO to engage and pay for on a monthly basis the consulting services of a private company owned by State Senator B, who was, at that time, not an elected public official. During that time, ALLEN discussed with State Senator B the possibility that State Senator B would eventually become an executive at VECO.

24.     From approximately January 2002 to August 30, 2006, during which time State Senator B was a member of the Alaska State Senate, ALLEN authorized VECO to continue to make monthly payments to the private company owned by State Senator B. Although ALLEN and VECO characterized these payments to State Senator B as being for consulting services, ALLEN acknowledges that in actuality the payments provided to State Senator B were in exchange for giving advice, lobbying colleagues, and taking official acts in matters before the legislature. Pursuant to this arrangement, VECO paid State Senator B a total of $243,250, comprised of the following yearly totals:

| Year  | Amount    |
|-------|-----------|
| 2002  | $47,500   |
| 2003  | $47,500   |
| 2004  | $47,500   |
| 2005  | $57,000   |
| 2006  | $43,750   |
| **TOTAL** | **$243,250** |

25.     From in or about January 2002 to in or about December 2004, ALLEN asked State Senator A to consult on one matter not pending before the Alaska State Legislature: a

-7-

matter involving sunken watercraft in an area in which VECO wanted to build a boat dock. ALLEN estimated that State Senator B's work on this non-legislative matter constituted less than 20 hours. During that time period, the remainder of State Senator B's payments and work performed related exclusively to State Senator B's performance of his official duties as a member of the Alaska State Legislature. The value of the payments from VECO to State Senator B far exceeded the value of the non-legislative consulting work done by State Senator B.

26. From in or about January 2005 to on or about August 30, 2006, ALLEN did not ask State Senator B to perform any consulting work unrelated to State Senator B's official position as a member of the Alaska State Legislature. During that time period, ALLEN instead asked State Senator B to use his official position to advance certain legislation pending in the Alaska State Legislature that ALLEN and VECO favored. ALLEN knew of no other substantive work that State Senator B performed in exchange for the "consulting" payments during this period.

27. In or about 2006, ALLEN also offered, and State Senator B agreed to accept, an offer of employment with VECO. On or about June 5, 2006, ALLEN called State Senator B to discuss a strategy for State Senator B to "kill" a piece of pending legislation that VECO did not support. In two separate conversations that day, ALLEN told State Senator B that he wanted State Senator B to work as an executive at VECO. Later, on or about June 25, 2006, State Senator B acknowledged he planned to become a VECO executive.

28. Similarly, on or about July 11, 2006, ALLEN and State Senator B discussed the need to keep quiet the fact that State Senator B planned to become a VECO executive after the close of the 2006 legislative session. In that conversation, ALLEN and State Senator B explicitly

-8-

discussed how State Senator B needed to ensure the passage of specific legislation before ALLEN and State Senator B disclosed the fact that State Senator B would thereafter be working for VECO.

29. State Senator B took multiple official acts consistent with the strategy for passage of legislation sought by ALLEN and/or SMITH. This strategy was repeatedly discussed among ALLEN, SMITH, and State Senator B. The acts taken by State Senator B in furtherance of that strategy included a series of votes in or about the summer of 2006 on a specific piece of legislation pending before the Alaska State Senate.

### F. Conspiracy to Impair and Impede the Internal Revenue Service

30. In or about 2005 and in or about 2006, ALLEN authorized the payment of a "special bonus" of corporate funds to certain VECO executives, including VECO Executive A and VECO Executive B, understanding that the funds were to allow VECO executives to make state and federal political campaign contributions without using their base salaries or performance-related bonuses. ALLEN understood that VECO routinely reported employee compensation, including bonuses, as legitimate corporate expenditures on VECO filings with the Internal Revenue Service of the United States Department of Treasury.

31. On or about February 2, 2006, ALLEN directed VECO Executive B to classify a personal expense of ALLEN's as a corporate expense in VECO's corporate accounts, knowing and intending that such personal expense would ultimately be recorded as a corporate expenditure on VECO's yearly filing with the Internal Revenue Service of the United States Department of Treasury.

### G. Total Amount of Illegal Payments Made by ALLEN and SMITH

32. Based on the conduct described herein, and including certain other criminal conduct not specifically included herein, ALLEN admits that the total amount of illegal benefits provided to elected public officials, their family members, and or their campaigns by ALLEN and SMITH totals an amount greater than $400,000.

### H. This Document Does Not Set Forth a Complete Statement of All Relevant Facts

33. ALLEN acknowledges that the statements and admissions contained in the foregoing Factual Basis for Plea do not constitute all of the facts relevant to the matters discussed herein, nor do the foregoing paragraphs contain a complete discussion of the acts taken and/or crimes committed by ALLEN and/or his co-conspirators. Instead, ALLEN understands that this Factual Basis for Plea is merely a summary of some, but not all, criminal conduct engaged in by ALLEN. ALLEN further understand that he may be required at future proceedings to provide further and more complete details of the matters discussed herein.

DATED: 2 May 2007

BILL J. ALLEN
Defendant

ROBERT J. BUNDY, Esq.
Attorney for BILL J. ALLEN

-10-