**WHITE & CASE**LLP
George J. Terwilliger III (admitted *pro hac vice*)
701 Thirteenth Street, NW
Washington, DC  20005
Phone: (202) 626-3628
Fax: (202) 639-9355
gterwilliger@whitecase.com

DORSEY & WHITNEY LLP
Robert C. Bundy (ABA # 7206021)
1031 West Fourth Avenue, Suite 600
Anchorage, Alaska 99501
Tele: (907) 257-7853
Fax: (907) 276-4152
bundy.robert@dorsey.com

*Attorneys for Defendant Bill J. Allen*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 3:07-cr-00057-JWS |
| BILL J. ALLEN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT BILL J. ALLEN'S MEMORANDUM IN AID OF SENTENCING

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 7

ANALYSIS OF SENTENCING FACTORS ............................................................ 9

I.     Legal Standards ........................................................................................... 9

       A.    After the Supreme Court's Decision in <u>Booker</u>, the U.S. Sentencing Guidelines Are No Longer Mandatory, Only Advisory. ................................... 9

       B.    The Government Must Prove Facts Relevant to Defendant's Sentence by a Preponderance of Evidence or by Clear and Convincing Evidence. ...................................................................................... 10

       C.    The Court's Determination of Mr. Allen's Sentence May Only Be Based Upon a Consideration of "Relevant Conduct." ................................... 11

       D.    Mr. Allen's § 1B1.8 Use Immunity Limits the Information That Can Be Used to Calculate His Sentence. ...................................................... 11

II.    Objections to the Presentence Report ........................................................ 14

       A.    The Presentence Report Should Not Include Any Information Obtained by the Government from Mr. Allen Pursuant to His Cooperation. ........................................................................................ 14

       B.    The Payments Made to State Legislators Were Gratuities, Not Bribes ......... 15

       C.    The Value of Payments Made to State Legislators, Even If an Evidentiary Basis Independent from Mr. Allen's Cooperation Exists, Should Be Limited to the Amount in the Factual Basis Given the Uncertainty Surrounding the Accuracy of the Findings in Other Trials. .................................................................................................. 19

       D.    Certain Payments to State Senator B for Consulting Services Were Legal at the Time of Payment. ...................................................... 20

       E.    The Presentence Report Improperly Includes Facts From the Cases in Which Mr. Allen Testified. ................................................................. 25

F.    Mr. Allen Objects to the Inclusion of Information Related to a Prior Investigation as "Relevant Conduct." ........................................... 25

G.    The Presentence Report Does Not Provide Any Facts That Support a Role Enhancement. ........................................................................ 26

H.    Sentencing Recommendation ......................................................... 28

III.    A Complete Factual Analysis of All the § 3553(a) Factors Should Result in a Sentence Below the Advisory Guidelines Range for Mr. Allen. ............................... 29

A.    Nature and Circumstances of Offense and Mr. Allen's History and Characteristics ............................................................................... 30

    1.    Personal History and Characteristics ...................................... 31

    2.    Medical Condition ................................................................. 34

    3.    Charitable Giving and Public Service ..................................... 36

B.    Seriousness of Offense, Respect for Law, and Just Punishment for the Offense ........................................................................................... 38

C.    Adequate Deterrence to Criminal Conduct ..................................... 39

D.    Protect the Public from Further Crimes .......................................... 40

E.    Education or Vocational Training, Medical Care, or Other Correctional Treatment ................................................................. 40

F.    Kinds of Sentences Available .......................................................... 41

G.    Sentence Disparities ....................................................................... 41

IV.    Mr. Allen Has Extensively Cooperated with the Government on Multiple Investigations, and Is Currently Providing Additional Cooperation ......................... 43

V.    Facility Recommendation ........................................................................ 45

CONCLUSION ................................................................................................ 45

# TABLE OF AUTHORITIES

## Supreme Court of the United States

Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007) ............................................................30

Kastigar v. United States, 406 U.S. 441 (1972)............................................................................13

Kimbrough v. United States, 552 U.S. 85, 128 S. Ct. 558 (2007)....................................................9

Rita v. United States, 551 U.S. 338 (2007)....................................................................................9

United States v. Booker, 543 U.S. 220 (2005)................................................................................9

United States v. Sun-Diamond Growers of California, 526 U.S. 398 (1999)..............................16

## United States Courts of Appeal

United States v. Ameline, 400 F.3d 646 (9th Cir. 2005) .........................................................17, 20

United States v. Borrero-Isaza, 887 F.2d 1349 (9th Cir. 1989)....................................................20

United States v. Burgos, 324 F.3d 88 (2d Cir. 2003)....................................................................26

United States v. Carty, 520 F.3d 984 (9th Cir. 2008) ....................................................................9

United States v. Charlesworth, 217 F.3d 1155 (9th Cir. 2000) ...............................................10, 26

United States v. Cooper, 394 F.3d 172 (3rd Cir. 2005) ................................................................36

United States v. Dove, 247 F.3d 152 (4th Cir. 2001) ....................................................................11

United States v. Dudden, 65 F.3d 1461 (9th Cir. 1995) ................................................................13

United States v. Flores-Payon, 942 F.2d 556 (9th Cir. 1991)........................................................12

United States v. Garcia, 522 F.3d 855 (9th Cir. 2008) .................................................................30

United States v. Griffin, 154 F.3d 762 (8th Cir. 1998)..................................................................16

United States v. Hopper, 177 F.3d 824 (9th Cir. 1999)............................................................18, 23

United States v. Howard, 894 F.2d 1085 (9th Cir. 1990) ..............................................................10

United States v. Jordan, 256 F.3d 922 (9th Cir. 2001) .............................................................10, 23

United States v. Lopez, 106 F.3d 309 (9th Cir. 1997)...................................................................38

United States v. Allen, 3:07-cr-00057-JWS

United States v. Mariano, 983 F.2d 1150 (1st Cir. 1993)................................................16

United States v. Mezas de Jesus, 217 F.3d 638 (9th Cir. 2000) .................................23

United States v. Mills, 329 F.3d 24 (1st Cir. 2003) ................................................43

United States v. Nakagawa, 924 F.2d 800 (9th Cir. 1991) ....................................13

United States v. Sanchez-Rodriguez, 161 F.3d 556 (9th Cir. 1998)..........................18

United States v. Schaefer, 291 F.3d 932 (7th Cir. 2002) .......................................11

United States v. Serafini, 233 F.3d 758 (3rd Cir. 2000) .........................................36

United States v. Smith, 839 F.2d 175 (3d Cir. 1988)..............................................43

United States v. Spears, 197 F.3d 465 (10th Cir. 1999) ........................................26

United States v. Staten, 466 F.3d 708 (9th Cir. 2006) ...........................................10

United States v. Stevens, 985 F.2d 1175 (2d Cir. 1993)........................................26

United States v. Vonner, 516 F.3d 382 (6th Cir. 2008) ...........................................9

United States v. Washington, 146 F.3d 219 (4th Cir. 1992).....................................12

United States v. Whitehead, 532 F.3d 991 (9th Cir. 2008)......................................9

**Statutes**

18 U.S.C. § 2 ...............................................................................................8

18 U.S.C. § 201 ...........................................................................................16

18 U.S.C. § 371 .............................................................................................8

18 U.S.C. § 666 ...........................................................................................16

18 U.S.C. § 666(a)(1)(B) ...............................................................................8

18 U.S.C. § 666(a)(2)................................................................................8, 16

18 U.S.C. § 1341 ...........................................................................................8

18 U.S.C. § 1343 ...........................................................................................8

18 U.S.C. § 1346 ...........................................................................................8

iv                                   United States v. Allen, 3:07-cr-00057-JWS

18 U.S.C. § 1951(a) ...................................................................................................8

18 U.S.C. § 3553(a) .............................................................................................. *passim*

18 U.S.C. § 3553(a)(1) ...........................................................................................30

18 U.S.C. § 3553(a)(2)(A) ..............................................................................16, 38

18 U.S.C. § 3553(a)(2)(B) .....................................................................................39

18 U.S.C. § 3553(a)(2)(C) .....................................................................................40

18 U.S.C. § 3553(a)(2)(D) .....................................................................................40

18 U.S.C. § 3553(a)(3) ...........................................................................................41

18 U.S.C. § 3553(a)(4) ...........................................................................................29

18 U.S.C. § 3553(a)(6) ...........................................................................................41

**U.S. Sentencing Guidelines**

U.S.S.G. § 1B1.3 ......................................................................................................8

U.S.S.G. § 1B1.3(a)(2) ...........................................................................................11

U.S.S.G. § 1B1.8 ................................................................................................. *passim*

U.S.S.G. § 1B1.8(a) .........................................................................................11, 15

U.S.S.G. § 1B1.8 cmt. n.5 ....................................................................................12

U.S.S.G. § 2B1.1 ..............................................................................................18, 24

U.S.S.G. § 2B1.1(b)(1)(D) .....................................................................................29

U.S.S.G. § 2C1.1 .....................................................................................15, 16, 18, 28

U.S.S.G. § 2C1.2 ..........................................................................................16, 18, 28

U.S.S.G. § 2C1.2(b)(1) ..........................................................................................28

U.S.S.G. § 2C1.2(b)(2) ..........................................................................................29

U.S.S.G. § 2C1.2(b)(3) ..........................................................................................29

U.S.S.G. § 3B1.1 ............................................................................................15, 26

U.S.S.G. § 3E1.1 .....................................................................................................29

U.S.S.G. § 5K1.1 ...................................................................................................6, 43

U.S.S.G. § 5K2.0 ........................................................................................................18

U.S.S.G. § 6A1.3 ...................................................................................................20, 24

U.S.S.G. § 6A1.3(a) ...................................................................................................20

U.S.S.G. § 6B1.2...........................................................................................................8

**State Constitution**

ALASKA CONST. art. XII, § 5...........................................................................................42

**State Statutes**

Alaska Stat. § 24.60.010(a)(1) (2006) ...........................................................................21

Alaska Stat. § 24.60.010(4) (2008)...........................................................................21, 23

2007 Laws of Alaska Ch. 47, § 31 (codified at Alaska Stat. § 24.60.085(c)) ..............................21

**State Opinions**

2005 Inf. Op. Att'y Gen., File No. 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, 2005 WL 2300397 ....................................21, 23

**Other Authorities**

U.S. Sentencing Comm'n, <u>Measuring Recidivism: The Criminal History
    Computation of the Federal Sentencing Guidelines</u> (2004)...................................................40

Roger W. Haines, Jr., Frank O. Bowman, III & Jennifer C. Woll, <u>Federal
    Sentencing Guidelines Handbook: Text and Analysis</u> (2008-2009 ed.)..................................27

# INTRODUCTION

On August 30, 2006, Bill Allen made a choice, indeed the first of a series of choices, which brings him before the Court for sentencing following his subsequent guilty pleas to felony offenses. The core of his choice was to recognize immediately, when confronted with his transgressions, the wrongfulness of his prior conduct, and to walk down a road of amends for his misdeeds. As detailed herein, Mr. Allen stands before the Court asking that the Court measure a lifetime of hard work, generosity and achievement against a relatively brief period of unlawful conduct followed by a nearly equal period of intensive cooperation, first with a clandestine government investigation and then with the drawn out process of prosecuting three elected officials and ongoing investigations of others that followed. We respectfully submit that when the Court considers the balances struck in the purposes and objectives of sentencing, it should exercise its discretion to incarcerate Mr. Allen for a relatively brief period of time, especially given his advanced age and medical conditions.

As discussed *infra* in detail, Mr. Allen's cooperation with authorities regarding the matters giving rise to the charges to which he will be sentenced was extensive. Not only does the government bear the burden of demonstrating that there is an evidentiary basis for the factors used to calculate Mr. Allen's base offense level pursuant to the U.S. Sentencing Guidelines ("Guidelines"), it also bears the burden of insuring that no statements or information that Mr. Allen provided pursuant to that cooperation be used in any way against him in determining his sentence. On the contrary, where there are questions about whether the basis for factors (other than as to the extent of his cooperation) used to determine his sentence consists of information provided by Mr. Allen, the government must establish that there is an independent source for that

information or the Court must exclude the information from its consideration in determining Mr. Allen's sentence.[1]

**Personal Characteristics**

Mr. Allen spent a lifetime building not only a company, but also building a reputation predicated on providing for others, including family and employees, and striving to improve the well-being of his fellow Alaskans. As a child, Mr. Allen worked in the fields from a young age to help support his family. He sacrificed his own education and dropped out of school so that he could work full-time. After moving to Alaska, Mr. Allen went from being an hourly employee to being the founder of a company that provided employment for thousands of Alaskans. For Mr. Allen, leading VECO Construction ("VECO") was not work, it was his life. Mr. Allen considered VECO employees to be his family, and he did everything in his power to ensure that they were provided with whatever they needed, whether that meant purchasing a wheelchair for an injured employee or helping to pay for college tuition.

Mr. Allen also believed that his responsibility included providing for others in the community who were less fortunate so that they would not face the same disadvantages he did. Mr. Allen participated extensively in charitable giving and community service. His focus on education led him to contribute to elementary schools, high schools and even local colleges and universities. He also worked to ensure that Alaskans would have employment and economic opportunities by donating to local vocational schools and focusing on hiring Alaskans.

**Cooperation with Authorities**

Mr. Allen's decision to cooperate was reached in recognition that he personally would have to pay a price in order to protect others from the collateral consequences of his misdeeds.

---

[1] See discussions infra pp. 11-13.

These people included his family and the thousands of employees of his company whose lives could be greatly adversely affected if the future of the company was put in jeopardy. His cooperation with authorities became a full-time job. He met regularly with FBI agents and federal prosecutors over the next two and a half years, and he participated in recorded phone conversations and wore recording devices in meetings with close friends. The record will disclose that Mr. Allen at all times strove to be scrupulously honest with the government personnel with whom he dealt during his cooperation. He has noted that there were times when he told the investigators information that he perceived they did not want to hear, especially concerning whether he had to pay money to certain individual legislators to gain their support for legislative objectives he sought.

Mr. Allen's cooperation is even more remarkable because throughout this time, as a result of the effects of a motorcycle accident, he suffered from severe cognitive disabilities that restricted his ability to communicate. As shown in professional medical reports attached as exhibits, the ramifications of his condition include that Mr. Allen's ability to read and spell is at grammar school levels. Moreover, his condition makes it difficult for Mr. Allen to process complex and compound questions in a coherent manner and to respond intelligently to the same. He has a difficulty in hearing that compounds his cognitive disabilities and actually requires him to both sit in close physical proximity to a speaker and to engage in a certain level of amateur lip reading in order to carry on a conversation.

Mr. Allen sufficiently overcame these challenges, however, to provide the United States with substantial assistance in the investigation of numerous individuals and, thus far, three resulting jury trials. Based on this cooperation, the government obtained three convictions and multiple guilty pleas. His cooperation, in fact, is ongoing and he continues to willingly assist the

government in multiple investigations. Mr. Allen has shown true remorse for his actions, and recognizes that his misconduct has resulted in great embarrassment to Alaska and its people.

**Motivation**

Media reports have wrongly suggested that Mr. Allen's prime motivation for his transgressions was personal greed and advancement. This is simply wrong. While Mr. Allen expected that if the gas pipeline were constructed, his company would have the opportunity to bid for, and could potentially obtain work in connection with, both the gas exploration and resource recovery that would result, his company did not need that work to carry on or to prosper. His motive was primarily born of his view that Alaska needed the economic benefits that this pipeline would bring to its people. While any energy exploration and delivery development project is subject to controversy, we are confident that the Court recognizes that Mr. Allen was steadfast in his belief that the legislative objectives he sought were things that would be good for Alaska and that that was much more important to him than any potential benefits for the company he had built over a lifetime into a global concern.

Others have recognized, as demonstrated in the attached letters of support and in video statements, that Mr. Allen felt strongly about Alaska and worked hard to improve the well-being of Alaskans. He wanted to promote job growth and a stable future for all Alaskans.

**Encouragement of Potential Cooperating Witnesses**

A traditional sentencing factor is the fundamental question of how the sentence imposed will deter others. However, in this case, we respectfully submit that the more relevant and important consideration is how the sentence imposed on Mr. Allen will encourage others who are in a position, as he was, to cooperate with a federal public corruption investigation. At present, at least one of the convictions obtained in a matter in which Mr. Allen was a key witness has

been abandoned by the government for reasons having nothing to do with the quality of Mr. Allen's cooperation. Other convictions have been challenged and may be in jeopardy, as may other potential indictments that were contemplated but have not yet been brought.

As a result, it is possible that Mr. Allen and one other cooperating individual could be punished while others who did not cooperate escape punishment as a result of this investigation. We respectfully submit that it would be unjust if those who cooperated the most were also punished most severely.

We do not suggest that Mr. Allen escape punishment for his transgressions of the law by avoiding any term of imprisonment whatsoever. The sentence in this case should, we respectfully submit, be one that strongly encourages others in a position in the future to cooperate to do so. In public corruption cases in particular, cooperation of involved individuals, especially those who have not abused the privileges of public office, are essential to a meaningful public corruption enforcement program. Therefore, we respectfully submit one substantial factor that favors mitigation of Mr. Allen's punishment is the benefit of doing so for effective law enforcement, particularly in regard to the investigation and prosecution of public corruption cases.

**Relative Culpability**

Relative culpability and public perception of relative punishment should also take into account the roles of the individuals involved in this matter. Without in any way minimizing the wrongfulness of Mr. Allen's conduct, or attempting to excuse or shift responsibility for his conduct elsewhere, nonetheless it is axiomatic that for a public office to be corrupted, public officeholders must stand ready and willing to be influenced by improper means. Indeed, the record shows that time and again, it was public officials, many of whom were Mr. Allen's

personal friends or long-standing acquaintances, who approached Mr. Allen and initiated the unlawful conduct; Mr. Allen has acknowledged responsibility for his response and does not seek to excuse it based on how it came about. But it is relevant to considerations of relative culpability to consider that these public officials knew how passionately Mr. Allen cared about the gas pipeline issue and used their public offices to solicit benefits from him. Mr. Allen did not create the environment in which his extending favors and funds to members of the Alaska Legislature could compromise the independence of legislative judgments. He wrongfully took advantage of the atmosphere that existed and he has accepted responsibility for his part of that sad occurrence.

**Base Offense Level Guidelines Calculation**

Mr. Allen submits that the Presentence Investigation Report ("Presentence Report") incorrectly calculates a base offense level under the Guidelines of 31, with an advisory Guidelines range of 108 to 135 months. The Presentence Report then recommends a reduction of the sentence to be imposed by a substantial amount pursuant to mitigating factors under 18 U.S.C. § 3553(a), recommending a 60-month sentence before further reduction under § 5K1.1 for substantial assistance to the government. If the Court were to accept the calculation in the Presentence Report, Mr. Allen submits that recognition of his extensive cooperation would dictate at least a 50 percent reduction of the term of imprisonment and a fine of $150,000.

As detailed below, Mr. Allen submits that a proper calculation of his advisory Guidelines range results in a correct base offense level of 18, and an advisory range of 27-33 months. In addition, a proper analysis of the other mitigating § 3553(a) factors and Mr. Allen's substantial assistance should result in a sentence of 12 to 16 months, and considering Mr. Allen's age and

medical condition, that a 12-month sentence be imposed consisting of 6 months of imprisonment with the remaining sentence to be served in home detention, and a fine of $150,000.

## FACTUAL BACKGROUND

The FBI approached Mr. Allen on August 30, 2006, and asked for his cooperation with the federal government's investigation into public corruption involving elected officials of or from Alaska. See, e.g., Trial Tr. at 5-137:9 – 5-138:5, United States v. Kohring, 3:07-cr-00055-JWS (D. Alaska Oct. 26, 2007); Aug. 30, 2006, FBI FD-302 (transcribed Sept. 9, 2006) at 1, Document 130-14, United States v. Stevens, 1:08-cr-00231-EGS (D.D.C. Oct. 5, 2008) ("Aug. 30, 2006, FBI 302").[2] Mr. Allen, without the benefit of counsel even though he requested an opportunity then to consult with counsel, decided on the spot to accept responsibility for his actions and to cooperate with the government in its investigations.[3] The investigations involved both Alaskan state legislators and federal officials whom Mr. Allen considered friends. He knew that the result of his cooperation would necessarily mean acting contrary to the interests of those with whom he had enjoyed these friendships.

From August 31, 2006 until April 2009, Mr. Allen cooperated with the government, submitting to at least 70 debriefings by the FBI, the Internal Revenue Service ("IRS"), the U.S. Attorney's Office for the District of Alaska, and/or lawyers from the Department of Justice's

---

[2] Although the United States has not provided Mr. Allen with a copy of a "detailed log of the notable events [on August 30, 2006] . . . documented in a separate report," the FBI advised Mr. Allen of unspecified "potential benefits of cooperation" that day. Aug. 30, 2006, FBI 302 at 1. The FBI's Form 302 report for August 30, 2006, lists Special Agents Mary Beth Kepner, Brian Due, and Chad Joy as being present during the initial meeting with Mr. Allen. Aug. 30, 2006, FBI 302 at 1.

[3] Mr. Allen notes that the Presentence Report included a three-level reduction for his acceptance of responsibility, PSR ¶ 129, and that the government has not objected to this calculation.

("DOJ") Public Integrity Section, and recording conversations and telephone calls with targets or subjects of the government's investigation.[4]

On May 2, 2007, after cooperating with the government for more than ten months, Mr. Allen signed his Plea Agreement with the United States. Mr. Allen pled guilty in Count One to conspiracy to commit: (1) Extortion under Color of Official Right (in violation of 18 U.S.C. § 1951(a)); (2) Federal Programs Bribery (in violation of 18 U.S.C. §§ 666(a)(1)(B) and 666(a)(2)); and (3) Honest Services Mail and Wire Fraud (in violation 18 U.S.C. §§ 1341,1343, and 1346); all in violation of 18 U.S.C. § 371. He also pled guilty in Count Two to bribery concerning programs receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(2) and 2, and, in Count Three, to conspiracy to impair and impede the IRS, in violation of 18 U.S.C. § 371. Plea Agreement, United States v. Allen, 3:07-cr-00057-JWS (D. Alaska May 2, 2007). On May 7, 2007, the Court accepted Mr. Allen's plea of guilty and reserved its acceptance of the Plea Agreement until his sentencing.[5]

Mr. Allen's extensive cooperation with the government's investigation included being the key government witness in jury trials that resulted in the September 25, 2007, conviction of former Alaska Representative Peter Kott, the November 1, 2007, conviction of former Alaska Representative Victor Kohring, and the October 27, 2008, conviction of former U.S. Senator Ted Stevens.

---

[4] We requested but did not receive from the government detailed information concerning the nature and extent of Mr. Allen's cooperation.

[5] There is a distinction between facts that the Court can consider as a basis for determining a defendant's sentence and facts that the Court can accept as a basis for the purposes of accepting a plea agreement. Compare U.S. SENTENCING GUIDELINES ("U.S.S.G.") § 1B1.3 (discussing facts that can be used to determine the Guidelines range), with U.S.S.G. § 6B1.2 (setting forth the policy statement regarding standards for accepting a plea agreement).

United States v. Allen, 3:07-cr-00057-JWS

**ANALYSIS OF SENTENCING FACTORS**

**I.     Legal Standards**

      **A.     After the Supreme Court's Decision in <u>Booker</u>, the U.S. Sentencing Guidelines Are No Longer Mandatory, Only Advisory.**

The U.S. Sentencing Guidelines ("Guidelines") are advisory.  <u>United States v. Booker</u>, 543 U.S. 220, 234 (2005).  While courts must still calculate an appropriate advisory range pursuant to the Guidelines, they must also consider other factors in reaching an appropriate sentence.  <u>Id.</u> at 259.

In sentencing Mr. Allen, this Court's "overarching statutory charge . . . is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care or other correctional treatment."  <u>United States v. Carty</u>, 520 F.3d 984, 991 (9th Cir. 2008) (citing 18 U.S.C. § 3553(a)).  While all sentencing proceedings are to begin by determining the applicable Guidelines range, <u>Kimbrough v. United States</u>, 552 U.S. 85, 128 S. Ct. 558, 574 (2007), the Court may not presume the Guidelines range is reasonable.  <u>Rita v. United States</u>, 551 U.S. 338, 350-51 (2007) (citing <u>Booker</u>, 543 U.S. at 259-60).  Summing up recent decisions of the Supreme Court, the Ninth Circuit most recently opined:

> One theme runs through the Supreme Court's recent sentencing decisions: <u>Booker</u> empowered district courts, . . . [and] breathed life into the authority of district court judges to engage in individualized sentencing . . . .

<u>United States v. Whitehead</u>, 532 F.3d 991, 993 (9th Cir. 2008) (citing <u>United States v. Vonner</u>, 516 F.3d 382, 392 (6th Cir. 2008) (en banc)) (internal citations and quotations omitted).

9

**B.      The Government Must Prove Facts Relevant to Defendant's Sentence by a Preponderance of Evidence or by Clear and Convincing Evidence.**

The government bears the burden to prove, by a preponderance of the evidence, the facts relevant to any enhancement of defendant's sentence.  United States v. Charlesworth, 217 F.3d 1155, 1158 (9th Cir. 2000); United States v. Howard, 894 F.2d 1085, 1090 (9th Cir. 1990) ("Since the government is initially invoking the court's power to incarcerate a person, it should bear the burden of proving the facts necessary to establish the base offense level.").  The defendant does not bear the burden to disprove them.  See id.  Additionally, if a particular fact or set of facts has an "extremely disproportionate effect on the sentence," then those facts must be proven with "clear and convincing evidence."  United States v. Jordan, 256 F.3d 922, 927-28 (9th Cir. 2001).  The Ninth Circuit recently reiterated the factors that must be considered in such a case:

> (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment;
>
> (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment;
>
> (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment;
>
> (4) whether the increase in sentence is based on the extent of a conspiracy;
>
> (5) whether the increase in the number of offense levels is less than or equal to four; and
>
> (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

Id. at 928 (internal citations and quotations omitted); see also United States v. Staten, 466 F.3d 708, 720 (9th Cir. 2006) (affirming that the government still had to show "clear and convincing

10

evidence" if the facts resulted in an extremely disproportionate impact on the defendant's

sentence post-<u>Booker</u>).

**C.    The Court's Determination of Mr. Allen's Sentence May Only Be Based Upon a Consideration of "Relevant Conduct."**

In determining Mr. Allen's sentence under the Guidelines, the Court may consider

"relevant conduct" that is "part of the same course of conduct or common scheme or plan as the

offense of conviction."  U.S.S.G. § 1B1.3(a)(2).  "Relevant conduct," as defined by the

Guidelines, must be *criminal* conduct, however, and the Court must expressly find that the

relevant conduct considered in calculating a defendant's advisory Guideline range was criminal

conduct.  <u>See</u> <u>United States v. Schaefer</u>, 291 F.3d 932, 941 (7th Cir. 2002); <u>United States v.</u>

<u>Dove</u>, 247 F.3d 152, 155 (4th Cir. 2001).

**D.    Mr. Allen's § 1B1.8 Use Immunity Limits the Information That Can Be Used to Calculate His Sentence.**

The Guidelines restrict the use of information provided by defendants pursuant to their

cooperation.  Section 1B1.8(a) provides that:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information *shall not be used in determining the applicable guideline range*, except to the extent provided in the agreement.

U.S.S.G. § 1B1.8(a) (emphasis added).

The determination of Mr. Allen's sentence, except to afford him a reduction for

cooperation, cannot be based on information and statements he provided to the government

during his cooperation because of the use immunity afforded to him by U.S.S.G. § 1B1.8.  The

Second Addendum/Cooperation Agreement to Mr. Allen's Plea Agreement specifically protects

his § 1B1.8 use immunity:

> On the express condition that I do not breach this Plea Agreement,
> and do not provide false or misleading information or testimony,
> the United States agrees it will not directly use against me any
> statements or information I have provided pursuant to this
> cooperation agreement in any federal criminal proceeding, and will
> not use these statements or information contrary to the policy set
> forth in U.S.S.G. § 1B1.8.

Second Addendum/Cooperation Agreement ¶ 10, United States v. Allen, 3:07-cr-00057-JWS (D.

Alaska May 4, 2007); see also Letter from Nicholas A. Marsh to Robert C. Bundy ¶ 5 (Aug. 31,

2006) (Mr. Allen's proffer letter providing that "No statement or information from you will be

used to enhance your sentence under the guidelines.") (Exhibit 1). In connection with his plea

agreement, Mr. Allen provided extensive cooperation, including meeting with government

investigators, agreeing to wear a recording device, and providing documents.

Based on Mr. Allen's § 1B1.8 immunity, the government cannot tender and the Court

may not use any statements or information provided by Mr. Allen pursuant to his cooperation to

determine his advisory Guidelines range. Any information in any documents, such as the Factual

Basis, based on Mr. Allen's statements, therefore, cannot be used to calculate his advisory

Guidelines range. See United States v. Flores-Payon, 942 F.2d 556, 559 (9th Cir. 1991)

("Guideline § 1B1.8 provides that when a defendant cooperates with the government by

providing information, and the government agrees not to use the information against the

defendant, the information shall not be used in determining the guideline range."). Section

1B1.8's restrictions apply to presentence reports, § 1B1.8 cmt. n.5, even if the defendant repeats

to the Probation Officer immunized information that he previously disclosed to authorities. See

United States v. Washington, 146 F.3d 219, 221-23 (4th Cir. 1992).[6]

---

[6] The fact that the statements in the Factual Basis cannot be used against Mr. Allen to calculate his sentence in no
way undermines the fact that this Court can use those facts as a basis to accept Mr. Allen's guilty plea. Thus, the
suggestion in the Sentencing Recommendation submitted with the Presentence Report that because Mr. Allen
challenges the use of these facts to calculate his sentence the Court may wish to reconsider acceptance of the guilty

As with any immunity granted by the government, "[o]nce the defendant has testified under a grant of statutory immunity, the government has the burden to prove that any evidence it intends to use against the defendant is derived from a legitimate source independent of the immunized statements." United States v. Dudden, 65 F.3d 1461, 1468 (9th Cir. 1995) (citing Kastigar v. United States, 406 U.S. 441, 461-62 (1972)). The record must clearly set forth the source of information used to calculate the defendant's advisory Guidelines range, and if information was used in violation of the plea or cooperation agreement, the sentence may be subject to reversal. United States v. Nakagawa, 924 F.2d 800, 803 (9th Cir. 1991).

Absent an independent source of such information, incriminating information that Mr. Allen provided in the course of cooperating with the government's investigation may not be used to calculate his base offense level under the Guidelines or to otherwise enhance his sentence, although such information may be used as the basis for any downward adjustment.[7]

In this matter, the government has not provided the Court with any delineation of which information contained in the Presentence Report used to calculate Mr. Allen's base offense level and used as a basis for determining his sentence was obtained independent of Mr. Allen's cooperation, which, as noted above, was lengthy, detailed, and extensive. Without such a delineation of independent sources for the information upon which his sentence is to be determined, we respectfully submit that the Court must reject the factual basis for determining Mr. Allen's sentence as contained in the Presentence Report.

---

plea is unfounded and appears to reflect confusion between the guilty plea (which has been accepted by the Court), the plea agreement (which has not yet been accepted), and sentencing (which is independent of both). See also supra p. 8 n.5.

[7] In part in order to distinguish information provided by Mr. Allen and information the government has from an independent source, Mr. Allen submitted a Brady request to the government on August 13, 2009, requesting relevant sentencing information from government files. Letter from George J. Terwilliger III, et al., to James M. Trusty, Deputy Chief, U.S. DOJ Gang Unit, et al. 4 (Aug. 13, 2009). The government stated that they did not believe that the information requested was material and has not provided any information in response to the request. Letter from James M. Trusty, Deputy Chief, U.S. DOJ Gang Unit, et al. to George J. Terwilliger III, et al. 3 (Sept. 16, 2008).

United States v. Allen, 3:07-cr-00057-JWS

## II.  Objections to the Presentence Report

On October 14, 2009, Probation Officer Karen M. Brewer filed the Presentence Report with the Court.  Mr. Allen objects to the following information contained in the Presentence Report.

### A.  The Presentence Report Should Not Include Any Information Obtained by the Government from Mr. Allen Pursuant to His Cooperation.

The government has not shown, and the Factual Basis and Stipulated Facts do not delineate on their face, facts and information that were obtained from Mr. Allen pursuant to his cooperation and therefore subject to § 1B1.8 immunity, and facts and information that were obtained from sources independent of information provided by Mr. Allen pursuant to his cooperation.  However, the Presentence Report relies on information contained in those documents to calculate an advisory Guidelines range.  Unless the government makes a showing of sources independent of Mr. Allen for those facts, any calculation of a base offense level based on that information results in an improper sentence imposed in an unlawful manner.

Mr. Allen objects to the use of any and all facts contained in the Presentence Report that are based on information regarding payments to federal officials contained in the Stipulated Facts.  Presentence Report ("PSR") ¶¶ 5, 144-47, 154.  The Stipulated Facts are not filed with the Court and were not made part of the factual basis for Mr. Allen's guilty plea.  In the Presentence Report, Ms. Brewer noted the objection by both the government and Mr. Allen to the inclusion of alleged payments to federal officials and properly excluded the payments from the calculation of Mr. Allen's base offense level.  PSR ¶ 107.  However, Ms. Brewer still includes information from the Stipulated Facts in the Presentence Report.  PSR ¶¶ 143-47.

Mr. Allen objects to the use of these facts for any purpose in calculating his advisory Guidelines range.  Specifically, Mr. Allen objects to counting former U.S. Senator Stevens and

U.S. Representative A as participants whose criminal activity Mr. Allen directed for the purposes of assessing a leadership enhancement pursuant to U.S.S.G. § 3B1.1.  See PSR ¶ 113; infra pp. 26-28.

The Stipulated Facts should not be considered—for any purpose—for two reasons.  First, the Stipulated Facts were never filed with the Court.  Second, the government has not shown that the Stipulated Facts can be considered under § 1B1.8(a) in calculating Mr. Allen's advisory Guidelines sentencing range, as they have shown no independent basis for the information beyond Mr. Allen's immunized statements.  As noted above, Mr. Allen retains § 1B1.8(a) immunity for any statements provided by him to the government pursuant to his cooperation agreement.  The Stipulated Facts clearly identify Mr. Allen as the source for the information contained therein, stating that "[Mr. Allen] hereby admits and swears to the following confession of additional criminal activity."  Stip. Facts at 1 (Exhibit 2).  No information contained in the Stipulated Facts can therefore be used in determining Mr. Allen's sentence.

## B.    The Payments Made to State Legislators Were Gratuities, Not Bribes.

Mr. Allen objects to the determination that § 2C1.1 should apply in calculating Mr. Allen's sentence, which is based on a conclusion that all payments or other benefits to state legislators were bribes, rather than gratuities.[8]  PSR ¶¶ 16-73, 76-93, 131-42.

---

[8] See, e.g., PSR ¶ 17 ("Kohring would receive money and other things of value in return for Kohring taking official acts as directed by the executives of VECO."); PSR ¶ 18 (Mr. Allen "gave Kohring the money to make sure that Kohring kept loyal to him"); PSR ¶ 21 ("Allen believed [that $1,000 was given to Kohring] to keep Kohring 'on board' and in support of the '20/20' PPT legislation."); PSR ¶ 26 ("Kohring stated [that in exchange for money] he would have [left Juneau to ensure that a vote on a specific bill did not occur] if that was what Allen asked him to do."); PSR ¶ 35 ("Allen . . . provided money and other financial benefits in exchange for Kott agreeing to perform, being influenced in performing, and ultimately performing official acts as a member of the Alaska Legislature, for the purpose of furthering VECO's business within Alaska."); PSR ¶ 36 ("In return for money and 'other things of value' that Kott received and attempted to receive, and that Weyhrauch allegedly attempted to receive, Kott and Weyhrauch each agreed to perform, attempted to perform, and actually performed official acts as members of the Alaska State Legislature that benefitted Allen and Smith, and VECO and its clients . . . ."); PSR ¶ 37 ("In return for Kott's agreement to perform, attempt to perform, and eventual performance of official acts to benefit VECO, Allen . . . provided Kott with financial benefits through cash payments to Kott, through inflated invoices prepared by Kott's Hardwood Flooring, and through VECO's agreement to provide Kott with a job as a lobbyist . . . ."); PSR ¶

United States v. Allen, 3:07-cr-00057-JWS

Any sentence imposed by the Court must "reflect the seriousness of the offense . . . and . . . provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The Guidelines allow for courts to apply either § 2C1.1 or § 2C1.2 for violations of 18 U.S.C. § 666(a)(2). Even if the Court found that some of the payments were bribes, it could still make the determination that § 2C1.2 was more appropriate to use in calculating Mr. Allen's sentence. To make that determination, the Court must "find the facts pertaining to the offense of conviction and make evaluative judgments concerning those facts (including a judgment as to whether [the defendant's] payments were intended to 'influence,' rather than 'reward' [government] officials)." United States v. Mariano, 983 F.2d 1150, 1158 (1st Cir. 1993). If a factual analysis reveals that the payment was not made to influence "the recipient [to do something he] would not otherwise have done," then the defendant's sentence should be calculated using § 2C1.2's gratuity provisions. United States v. Griffin, 154 F.3d 762, 763 (8th Cir. 1998). The distinction between a bribe and a gratuity under 18 U.S.C. § 666 and other federal statutes is grounded in a bribe involving a *quid pro quo* ("something for something") and a gratuity lacking that element. See United States v. Sun-Diamond Growers of California, 526 U.S. 398, 404 (1999) ("[I]n differentiating between a bribe and an illegal gratuity [under 18 U.S.C. § 201], . . . only a bribe requires proof of a *quid pro quo*.").

A review of the relevant facts in this matter reveals that the payments described in the Presentence Report constitute conduct that is more accurately addressed under the gratuity provisions of the Guidelines, § 2C1.2, and not the bribery provisions. U.S.S.G. § 2C1.1. As

---

39 ("Allen . . . agreed to make contributions to support one of Kott's relatives in a local school board race, and explicitly discussed that such contributions would help VECO gain influence with Kott."); PSR ¶ 51 ("Weyhrauch, Smith and Allen met for several hours at a restaurant hotel in Anchorage, Alaska, and discussed, among other things, Weyhrauch's alleged request for employment with VECO and Weyhrauch's alleged support of the 20/20 PPT legislation."); PSR ¶ 137 ("Allen provided Masek with $2,000 in U.S. currency, which Masek accepted knowing that it was given, in part, because of her agreement to withdraw HB 300.").

noted above, because Mr. Allen retains his § 1B1.8 immunity, the government must provide an independent basis to prove that his sentence should be calculated under the bribery provision of the Guidelines.

The Presentence Report fails to show a connection between certain payments and specific actions by legislators, the *quid pro quo* necessary to determine that a payment was a bribe. The Presentence Report refers to Mr. Allen's immunized testimony in which he said that he provided money to Mr. Kohring because Mr. Kohring "was sleeping in his office and had little food," as well as to keep Mr. Kohring loyal. PSR ¶ 18. Mr. Smith testified that VECO hired Mr. Kohring's nephew "hoping that Kohring would continue to support their political issues." PSR ¶ 22. The Presentence Report also refers to Mr. Kohring approaching Messrs. Allen and Smith about a personal debt, and then Mr. Allen providing Mr. Kohring with money for gifts for his daughter. PSR ¶ 24. No evidence is presented in the Presentence Report detailing any *quid pro quo* agreement between Mr. Allen and Jim Clark that supports the allegation that any payments to Mr. Clark were bribes. PSR ¶¶ 77-93. The Presentence Report also fails to cite any source for the factual allegations that payments provided to former Alaska Representative Kott were in exchange for specific legislative actions. See PSR ¶¶ 30-63. Absent an independent source of such information, the Court cannot be certain that the information provided in the Presentence Report complies with Mr. Allen's § 1B1.8 immunity.

The Court may not assume that information in the Presentence Report is "presumptively accurate," which would improperly place the burden on the defendant to disprove those facts. United States v. Ameline, 400 F.3d 646, 657 (9th Cir. 2005). As noted above, the major impact of the difference between the bribery and gratuity provisions, a difference of three levels which could result in a nearly 30 percent reduction in a sentence based on the Presentence Report's

base offense level, calls for the Court to require the government to establish the applicability of the bribe Guidelines by clear and convincing evidence.  United States v. Hopper, 177 F.3d 824, 833 (9th Cir. 1999) (applying clear and convincing standard because of potential 48 month sentence increase).

Additionally, the Presentence Report categorizes *all* the payments as bribes under § 2C1.1, without an individualized analysis of each payment.  As a result, some payments that the Court might properly determine to be gratuities are grouped with bribes, resulting in a 12-level increase in Mr. Allen's base offense level under § 2C1.1, compared to a 9-level increase for gratuities under § 2C1.2.  The three-level difference, when combined with the loss calculation pursuant to § 2B1.1 results in large sentencing disparities.  For example, assuming *arguendo* that the Presentence Report's base offense level calculation is correct and Mr. Allen's base offense level is 31, that level corresponds to a sentencing range of 108 to 135 months.  However, if the Court applied § 2C1.2 to calculate the offense level, the three-level reduction would correspond to a sentencing range of 78 to 97 months, a difference of two to three years.  The Presentence Report argues for a sentence based on a determination that all the payments were bribes, even if Mr. Allen's conduct falls outside the heartland of the bribery Guidelines provisions.  In such cases, the Court should consider whether such a determination and resulting sentence is appropriate in light of the conduct.  See United States v. Sanchez-Rodriguez, 161 F.3d 556, 561 (9th Cir. 1998) (noting that a downward departure is appropriate if the district court determines that the facts of the case are outside the heartland of the Guidelines provisions); see also U.S.S.G. § 5K2.0 (stating that if circumstances exist in a case that the Sentencing Commission did not adequately take into consideration in determining the applicable Guidelines range, a departure may be warranted).

Mr. Allen did not give money to all legislators whom he approached regarding supporting certain positions on legislative matters.[9]  While Mr. Allen did provide payments to some legislators, the preponderance of the evidence supports the conclusion that he did so as much because he considered them to be friends or acquaintances in need, for whom the payments made would exert influence but not because they would take specific acts in exchange for the funds provided.  On this distinction, it is critical that the government provide information independent of that obtained through Mr. Allen's cooperation that demonstrates, by clear and convincing evidence, that the bribery provisions be utilized to calculate Mr. Allen's sentence.

      C.    **The Value of Payments Made to State Legislators, Even If an Evidentiary Basis Independent from Mr. Allen's Cooperation Exists, Should Be Limited to the Amount in the Factual Basis Given the Uncertainty Surrounding the Accuracy of the Findings in Other Trials.**

Assuming, *arguendo*, that the government could provide an independent factual basis for the payments Mr. Allen made to Messrs. Kott and Kohring, Mr. Allen objects to the inclusion of the value of payments and benefits to Messrs. Kohring ($28,724) and Kott ($29,743) based on findings from their sentencing hearings.  PSR ¶¶ 29, 66, 105.  In both cases, the Court made its findings based upon information provided by Mr. Allen.  However, information provided by Mr. Allen pursuant to his cooperation cannot be used to calculate his sentence pursuant to his § 1B1.8 immunity and, unless the government can provide an independent source for the value of the payments, the Court may not consider those amounts in calculating Mr. Allen's sentence.

Moreover, any information considered by the Court in calculating Mr. Allen's advisory Guidelines range must be reliable.  Although the Court may consider "a wide, largely unlimited

---

[9] In an attempt to determine the exact number of legislators to whom Mr. Allen did not make illegal payments, Mr. Allen's August 13, 2009, <u>Brady</u> demand also included a request for such information.  Letter from George J. Terwilliger III, et al., to James M. Trusty, Deputy Chief, U.S. DOJ Gang Unit, et al. 4 (Aug. 13, 2009).  As noted elsewhere, the government has not provided any information regarding to Mr. Allen in response to the request. Letter from James M. Trusty, Deputy Chief, U.S. DOJ Gang Unit, et al. to George J. Terwilliger III, et al. 3 (Sept. 16, 2008).

        <u>United States v. Allen</u>, 3:07-cr-00057-JWS

variety of information" at sentencing, the Court "may not consider improper, inaccurate, or mistaken information, nor may [it] make unfounded assumptions or groundless inferences in imposing sentence." United States v. Borrero-Isaza, 887 F.2d 1349, 1352 (9th Cir. 1989). The Court must also be certain that any information it considers when calculating Mr. Allen's advisory Guidelines range "has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Mr. Allen did not have an opportunity to contest those findings, and the accuracy and reliability of those findings is currently in question. See Mot. to Dismiss, United States v. Kott, 3:07-cr-00056-JWS (D. Alaska Sept. 24, 2009); Order, United States v. Kohring, No. 08-30170 (9th Cir. June 10, 2009) (remanding Mr. Kohring's case on government's motion). It is not the defendant's burden to disprove the facts cited in the Presentence Report. Ameline, 400 F.3d at 657.

The Court should not consider the payment amounts provided in the Presentence Report in calculating Mr. Allen's sentence because that information was clearly provided by Mr. Allen pursuant to his cooperation. The only information regarding payment amounts for which the government may have a source independent of information provided by Mr. Allen is contained in the Factual Basis. If the government can demonstrate an independent source for the amounts included in the Factual Basis, then only that information regarding the amount of payments to Messrs. Kott and Kohring could be used consistent with §§ 1B1.8 and 6A1.3, and therefore be the appropriate payments amounts for the Court to consider—between $2,100 and $2,600 to Mr. Kohring, and $8,993 to Mr. Kott. Factual Basis ¶¶ 11, 13, 14.

**D.    Certain Payments to State Senator B for Consulting Services Were Legal at the Time of Payment.**

Mr. Allen objects on several grounds to the inclusion of payments to State Senator B as part of the consideration for calculating the base offense level for his sentencing. PSR ¶¶ 74,

105, 107.  First, the government has not identified an independent basis showing that specific payments were in exchange for legislative favors.  See § 1B1.8.

Second, assuming *arguendo* that payments were for legislative favors, the government also has not shown that the entire amount of compensation was criminal conduct; any portion of the compensation that was not criminal conduct would not be relevant conduct for the purposes of Mr. Allen's advisory Guidelines calculation.[10]  Separate from payments relating to official duties, the Presentence Report found that Mr. Allen "acknowledge[d]" that payments to State Senator B were also for the purpose of obtaining "advice" for VECO and to lobby State Senator B's colleagues on VECO's behalf.  PSR ¶ 74.  Yet compensation for such services cannot be considered relevant conduct because such compensation was legal.  State law presumes that legislators will have outside employment, see Alaska Stat. § 24.60.010(4) (2008), and the state's own Department of Law previously concluded that VECO's compensation of State Senator B— notwithstanding the "'advice and loyalty' that goes along [with] any employment"—was proper.  2005 Inf. Op. Att'y Gen., File No. 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, 2005 WL 2300397, at *13 (Sept. 7, 2005).  Additionally, it was not until the enactment of the Comprehensive Ethics Act of 2007 that compensation for a legislator's "legislative," "administrative," or "political" services was prohibited.  Compare Alaska Stat. § 24.60.085(a)(1) (2006) with 2007 Laws of Alaska Ch. 47, § 31 (codified at Alaska Stat. § 24.60.085(c)).  Furthermore, State Senator B received payments from VECO for six years for such services before he became a member of the Alaska legislature.

---

[10] The government apparently takes the position that State Senator B provided no legitimate services to VECO. However, the government bears the burden to provide evidence, independent of any information provided by Mr. Allen pursuant to his § 1B1.8 immunity, justifying their position prior to the Court making a determination on the purpose of the payments.  Mr. Allen requested information about whether payments to legislators were bribes, gratuities, or neither, yet the government has refused—not on the grounds that a review of the government's files found no favorable information, but on an assertion the distinction is not material.  See Letter from James M. Trusty, Deputy Chief, U.S. DOJ Gang Unit, to George J. Terwilliger III 3, ¶ 10 (Sept. 16, 2009).  On Monday, October 19, 2009, Mr. Allen renewed this request specifically as to State Senator B.

The Presentence Report properly excludes these payments from the amount used to calculate Mr. Allen's advisory Guidelines range. Since the government has not provided any evidence that payments to State Senator B after he became a legislator differed from the payments provided prior to that time, payments after he became a legislator should also be excluded from the sentencing calculation.

No evidence has been identified that Mr. Allen's payments to State Senator B were made as part of any *quid pro quo* agreement related to the 20/20 PPT legislation. Without such evidence, the government has failed to meet its burden to show that any portion of the payment was a bribe. Further, the government cannot point to any specific evidence to show that any compensation paid to State Senator B before 2006 related to the 20/20 PPT legislation, or any other legislation or legislative acts, even as a gratuity. Thus, under any theory, bribe or gratuity, no amount paid to State Senator B for the years 2002 through 2005 should be included in the calculation of Mr. Allen's base offense level.

Furthermore, the government has also failed to provide a basis for allocating the compensation paid to State Senator B between advice, lobbying, and the taking of official acts. It is simply not sufficient for the government to claim that, because there was an absence of demonstrated tasks performed by State Senator B on VECO's behalf, that the entire amount should be considered as part of a corrupt payment. In the first instance, it would be improper for the Court to conclude that the absence of information is sufficient to prove that affirmative fact as to which the government has the burden. More importantly, however, it is a well known and established practice for companies to have retainer agreements with lobbyists or government relations consultants to secure their present and future services, or prevent a competitor from securing such services, regardless of whether, at any particular point, they are performing

specific tasks.  As the state's Department of Law recognized, outside employment is the norm, not the exception, in a state that stresses the importance of maintaining a citizen-legislature. 2005 Inf. Op. Att'y Gen., File No. 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, 2005 WL 2300397, at *13 (Sept. 7, 2005) ("[T]here is the expectation that legislators will be permitted to seek outside employment.") (citing Alaska Stat. § 24.60.010(4)).

Even if some allocation of those payments were appropriately considered in the calculation of Mr. Allen's advisory Guidelines range, at most the Presentence Report should only allocate a *pro rata* share of the compensation based on the legislature's short regular session, which lasts only three months out of the year.  <u>Cf.</u> Sent. Hr'g Tr. at 43:11-15, <u>United States v. Kott</u>, 3:07-cr-00056-JWS (D. Alaska Dec. 7, 2007) (applying same analysis to value the employment opportunity Mr. Allen offered to former State Representative Kott).  Accordingly, no more than 25 percent of State Senator B's total compensation from VECO for 2006, or $10,937.50 (25 percent of $43,750), could represent the maximum consideration State Senator B's compensation could receive in the calculation of Mr. Allen's advisory Guideline sentencing range.

Although the government must generally prove facts supporting the Guidelines calculation by a preponderance of the evidence, if a specific determination has a "disproportionate impact" on the defendant's sentence, the government must demonstrate those facts by clear and convincing evidence.  <u>United States v. Jordan</u>, 256 F.3d 922, 928 (9th Cir. 2001); <u>United States v. Mezas de Jesus</u>, 217 F.3d 638, 643-45 (9th Cir. 2000) (applying clear and convincing standard when factors increased a sentence from less than two years to almost five years); <u>Hopper</u>, 177 F.3d at 833 (applying clear and convincing standard because of potential 48-month sentence increase).

In Mr. Allen's case, the government should prove facts related to the amount of payments to legislators by clear and convincing evidence. Based on the Presentence Report, payments to legislators totaled $395,267 and Mr. Allen's sentencing range would be 108 to 135 months. However, Mr. Allen contends that if any amount may be considered consistent with §§ 1B1.8 and 6A1.3, it should be limited to the amount specified in the Factual Basis: between $36,093 and $36,593—between $2,100 and $2,600 to Mr. Kohring, $8,993 to Mr. Kott, and $25,000 of proposed contributions involving Mr. Cowdery. Factual Basis ¶¶ 11, 13, 14, 21. A comparison of the two calculations, along with the resulting changes to the Guidelines range is presented below:

| Recipient of Payment or Benefit | Presentence Report § 2B1.1 Amounts (PSR ¶¶ 105-06) | Proper § 2B1.1 Amounts |
|---|---|---|
| Former Rep. Kohring | $28,724 | $2,100-$2,600 |
| Former Rep. Kott | $29,743 | $8,993 |
| Former Sen. Cowdery | $25,000 | $25,000 |
| State Senator B | $243,250 | n/a |
| J. Clark | $68,550 | n/a |
| **Total** | **$395,267** | **$36,093-$36,593** |
| Guidelines Adjustment (U.S.S.G. § 2B1.1) | +12 ($200,000-$400,000) | +6 ($30,000-$70,000) |

A sentence calculated based on payments of $36,093 corresponds to a sentencing range of 27 to 33 months, 25 percent of the base offense level range calculated in the Presentence Report. The disparity between the amount proposed by the Presentence Report and the amount calculated by Mr. Allen demands that the government provide clear and convincing evidence of the amount of all the payments to be included, and must do so with evidence derived from

sources independent of any statements or information provided by Mr. Allen pursuant to his cooperation.

**E.    The Presentence Report Improperly Includes Facts From the Cases in Which Mr. Allen Testified.**

Mr. Allen objects to the use of any post-conviction facts related to the cases in which Mr. Allen testified to enhance his sentence, to negate or mitigate the value of his cooperation, or to impact adversely any other basis to reduce his sentence below the advisory Guidelines range. PSR ¶¶ 29, 66, 152.  Any activity in those cases resulting from government misconduct is irrelevant to the calculation of Mr. Allen's advisory Guidelines range.  Mr. Allen complied with his Cooperation Agreement, under which he agreed to provide information and testimony against others and the government agreed not to use that information and testimony to determine Mr. Allen's sentence pursuant to § 1B1.8.  Cooperation Agreement ¶ 10.  Mr. Allen cooperated with the government, testified as part of that cooperation, and provided information that led to a conviction in each case.  PSR ¶¶ 29, 66, 152.  The fact that alleged government misconduct resulted in the dismissal of charges in one case and has potentially placed the other two convictions at risk of reversal is not the result of any conduct or wrongdoing by Mr. Allen.

**F.    Mr. Allen Objects to the Inclusion of Information Related to a Prior Investigation as "Relevant Conduct."**

Mr. Allen objects to the inclusion of any details related to a prior investigation of the Alaska Political Action Committee ("APAC").  PSR ¶ 75 n.4.  Information about the investigation is not "relevant conduct as part of the same course of conduct" that relates to the same common scheme or plan to which Mr. Allen pled guilty.  The alleged misconduct in the APAC matter occurred over 20 years ago and bears no relation or relevance to the conduct described in the Presentence Report.  Any allegations of wrongdoing that are not "part of the same course of conduct or common scheme or plan" as the facts to which Mr. Allen pled guilty

should not be considered conduct relevant to the calculation of his advisory Guidelines sentencing range.

### G. The Presentence Report Does Not Provide Any Facts That Support a Role Enhancement.

Mr. Allen objects to the role enhancement adjustment contained in the Presentence Report.  PSR ¶ 110-13.

Evidence from the Factual Basis does not support any enhancement for Mr. Allen's role in the offense.  The government bears the burden of establishing, by clear and convincing evidence, that defendant was an organizer, leader, manager, or supervisor of criminal activity. U.S.S.G. § 3B1.1; see Charlesworth, 217 F.3d at 1158; United States v. Spears, 197 F.3d 465, 468-69 (10th Cir. 1999).  The Court must be able to "make findings in the record that describe the defendant's exercise of control or decision making authority."  Spears, 197 F.3d at 469.  The Court must be able to cite specific facts and explain why the defendant's role justifies the role enhancement.  United States v. Stevens, 985 F.2d 1175, 1184 (2d Cir. 1993) ("It did not suffice for the court simply to state that it had 'no doubt' that [the defendant] controlled the operation, without giving some explanation as to the evidentiary basis for its view.").

In determining whether to include additional offense levels for defendant's role, the fact that defendant played an important or even essential role in the offense is insufficient to justify an aggravating role adjustment.  Leadership qualities and the supervision of non-criminal activities (e.g., Mr. Allen's status as VECO's Chief Executive Officer or reference to Mr. Smith as Mr. Allen's "second in command") are insufficient.  PSR ¶ 113; see United States v. Burgos, 324 F.3d 88, 93 (2d Cir. 2003) (noting that the assessment of whether an individual is a leader or organizer under the Guidelines cannot be solely based on the fact that they are the owner of a business and that some of the criminal activity occurred on the business' premises or that

employees participated in the scheme); ROGER W. HAINES, JR., FRANK O. BOWMAN, III & JENNIFER C. WOLL, FEDERAL SENTENCING GUIDELINES HANDBOOK: TEXT AND ANALYSIS 1092-93 (2008-2009 ed.) (collecting cases). Additionally, simply supporting the passage of a particular piece of legislation is not necessarily criminal activity and, without additional information, is not a sufficient basis for imposing a leadership enhancement.

The Presentence Report does not provide an independent basis for an assessment that would justify a leadership enhancement consistent with § 1B1.8. Additionally, there are no specific facts cited in support of the leadership enhancement: the Presentence Report only makes conclusory statements about Mr. Allen's statements and then "assess[es] that . . . Allen was an organizer or leader." PSR ¶ 113. Such a threadbare basis for increasing Mr. Allen's offense level by <u>four levels</u> does not enable the Court to specifically cite facts and explain why Mr. Allen's actions justify any role enhancement, and, given the significance of the enhancement to Mr. Allen's advisory Guidelines range, facts justifying such an enhancement should be established by clear and convincing evidence.

Indeed, many facts are contrary to a conclusion that Mr. Allen had a leadership role that merits a maximum enlargement under the Guidelines. The record shows that time and again, it was the elected or appointed officials, many of whom were Mr. Allen's personal friends, who approached Mr. Allen, and they initiated the unlawful conduct to which Mr. Allen responded. These public officials knew how passionately Mr. Allen cared about the gas pipeline issue and used their public offices to obtain financial benefits in connection with their support for these objectives. Mr. Kohring drew on Mr. Allen's sympathies with his claims of financial need, PSR ¶¶ 18, 24, and Mr. Kohring affirmatively called Mr. Allen to offer his services and support. PSR ¶ 23. Similarly, Mr. Kott "solicited [money and financial benefits] from Allen and Smith," and it

was Mr. Kott who approached Mr. Allen regarding employment at VECO. PSR ¶ 35. Mr.

Weyhrauch also instigated the request for legal work from VECO. PSR ¶¶ 35, 38, 42, 44. The

Presentence Report also makes clear that it was Governor Murkowski's Chief of Staff, Jim

Clark, who originated and carried out the plan for unlawful campaign support; Mr. Allen

(through Mr. Smith) responded to Mr. Clark's requests. PSR ¶¶ 82, 84, 87-89. Mr. Cowdery

approached Mr. Allen about providing funds to another state senator. PSR ¶ 68. Even State

Representative Masek initiated contact with Mr. Allen with a tale of financial and personal

despair in order to get money from him. PSR ¶ 133. All of these accounts have one important

common feature: Mr. Allen was seen as a resource by elected and appointed officials who

allegedly used their office to seek personal gain. Mr. Allen did not lead them anywhere near as

much as he responded to solicitations by them. Accordingly, Mr. Allen's advisory Guidelines

range should not be based on a four-level role enhancement.

### H. Sentencing Recommendation

As a result of the above objections, Mr. Allen objects to the Guidelines calculation set

forth in the Presentence Report, PSR ¶¶ 101-30, and respectfully submits that the properly

calculated Guidelines range is a total offense level of 18 resulting in a sentencing range from 27

to 33 months, before any downward departure based on Mr. Allen's extensive cooperation. The

government has indicated to Mr. Allen that it intends to file such a motion:[11]

| Guidelines Range |
|---|
| *BASE OFFENSE LEVEL U.S.S.G. § 2C1.2* ..................................................................... *9* |
| *MORE THAN ONE GRATUITY U.S.S.G. § 2C1.2(b)(1)* ............................................. *+2* |

---

[11] If the Court determines that the payments were bribes, not gratuities, the base offense level would increase by three. U.S.S.G. § 2C1.1.

| Guidelines Range |
|---|
| *VALUE OF PAYMENT IN EXCESS OF $30,000 U.S.S.G. §§ 2C1.2(b)(2); 2B1.1(b)(1)(D)* ...........................................+6 |
| *SCHEME INVOLVING ELECTED PUBLIC OFFICIAL U.S.S.G. § 2C1.2(b)(3)* .....+4 |
| *ROLE ENHANCEMENT* ...................................................................................0 |
| *ACCEPTANCE OF RESPONSIBILITY U.S.S.G. § 3E1.1* ...........................................-3 |
| *TOTAL OFFENSE LEVEL*..............................................................................18 |
| *ESTIMATED CRIMINAL HISTORY*.................................................................I* |
| *SENTENCING RANGE* ........................................................ 27-33 months |
| *SUPERVISED RELEASE RANGE* ................................................... 3-5 Years |
| *FINE RANGE* ......................................................................$6,000 - $60,000 |

## III. A Complete Factual Analysis of All the § 3553(a) Factors Should Result in a Sentence Below the Advisory Guidelines Range for Mr. Allen.

The advisory Guidelines range is only one of seven factors to be considered. 18 U.S.C. § 3553(a)(4). The Court's final determination of Mr. Allen's sentence must include an analysis of all the § 3553(a) factors. Section 3553(a) requires the Court to consider:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)  the need for the sentenced imposed
>> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B)  to afford adequate deterrence to criminal conduct;
>> (C)  to protect the public from further crimes of the defendant; and
>> (D)  to provide the defendant with needed educational or vocational, training, medical, or other correctional treatment in the most effective manner;
> (3)  the kinds of sentences available;
> (4)  the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable

category of defendant as set forth in the [U.S. Sentencing Guidelines] . . .;

(5) any pertinent policy statement . . . issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendant with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The defendant bears the burden of establishing the facts relevant to the § 3553(a) factors by a preponderance of the evidence. United States v. Garcia, 522 F.3d 855, 860 (9th Cir. 2008). Although the Court must adequately explain any deviation from the advisory Guidelines range, the Supreme Court recently "reject[ed] . . . an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." Gall v. United States, 552 U.S. 38, 128 S. Ct. 586, 595 (2007). Thus, a complete review of all the factors allows the Court to provide a tailored sentence for Mr. Allen, including one that could be below the advisory Guidelines range.

## A. Nature and Circumstances of Offense and Mr. Allen's History and Characteristics

The first factor that the Court must consider is the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Mr. Allen submitted to the Probation Officer a letter outlining his personal history and characteristics. See Letter from Tess Lopez to Karen Brewer, U.S. Probation Officer (Sept. 9, 2009).

With respect to the circumstances of the offense, Mr. Allen recognizes the serious nature and gravity of the charges to which he pled guilty in this case and understands that his actions, and the actions of others, have undermined the public's trust in the Alaskan government. Mr. Allen regrets his conduct and, upon being confronted with the evidence against him, he immediately cooperated with the government in numerous criminal investigations.

1. <u>Personal History and Characteristics</u>

Mr. Allen was born in 1937 in Soccoro, New Mexico and raised in extreme poverty. Mr. Allen had eight siblings, four of whom are still living, his sisters Addie Chancellor and Betty Allen, and his brothers Joe Allen and Roger Allen. To this day, Mr. Allen maintains close contact with all his siblings.

To help his parents support the family, he began working in the fields at the age of eight when the family moved to Oregon. During this time, his father often traveled to find work and would be away from the family for extended periods of time. Mr. Allen was forced to stop attending school at the age of 15 to work full-time. The family generally lived in tents or abandoned houses with dirt floors, which lacked electricity or running water. Mr. Allen and his sister Addie adopted the "caretaker" roles within the family and even to this day, Mr. Allen supports his family both financially and emotionally.

Despite his lack of education, Mr. Allen was able to overcome these difficulties. In search of employment, he moved to Gallup, New Mexico where his older brother lived, and he began working for El Paso Natural Gas learning to fit pipe in the oil fields. By the age of 17, he became a welder and traveled extensively as required by his job.

In 1957, Mr. Allen married Doris Mace in Aztec, New Mexico, with whom he had three children, Shannon West, Mark Allen, and Tammy Allen. Although Mr. Allen knew his wife was having affairs, he stayed with her until the children grew up; he eventually divorced her in 1972. Mr. Allen shares a very close relationship with all of his children, his seven grandchildren, and his three great-grandchildren. As noted in the letters to the Court, Mr. Allen is extremely generous. He has spent his life caring for his siblings, his mother, his children, his grandchildren, and his great grandchildren. The importance of Mr. Allen's family is evident in the words they have written and spoken about him (attached hereto as Exhibits 3 and 4):

- My dad is the hardest working man I have ever known.  Dad wore several hats in his life and when my sisters and I were growing up even during hard times he always made sure we had clothes on our back and food on the table.  My dad's success did not come by easy.  He worked day and night to make sure his family had what they needed.  Dad's success made it possible to help his grandchildren and great grandchildren.  Not to mention his own brothers and sisters.  Dad was an asset to the community of Anchorage and the state of Alaska.  He helped many charities and sponsorships with a warm heart.  Letter from Mark J. Allen to Hon. John W. Sedwick (Aug. 25, 2009).

- When we were growing up [my father] worked very hard for his family.   Alaska was his home; [h]e said Alaska has been good to him so he always tried to give back to Alaska.  On a trip to Russia, he saw a little boy there and he was in a wheel chair that [my father] saw . . . was old and broken, so my father out of [sheer] kindness went down and bought him a new one knowing his family couldn't afford it.  That is what my dad does.  He is a giving man.  My Dad has a big heart and would do anything for his family and his friends.  Letter from Shannon West to Hon. John W. Sedwick (Aug. 29, 2009).

- I remember thinking about [my Uncle] Bill and how this tall, skinny boy back in the early '50's achieved "all this[.]"  [T]he answer was because here was a man who came from "nothing" and he worked his way up in the oilfield and with HARD work.  He had not education but his mind was brilliant . . . one of his foremen at Prudhoe Bay, Marvin King, told me his version of Bill Allen . . . "to get it done all you had to say to Bill Allen was it couldn't be done" and he would FIND a way.  Letter from Cheryl Carpenter Black to Hon. John W. Sedwick.

- Ever[] since I can remember, Bill was the main support of our family. . . . When I was very young the only way he could do this was to pick fruit and hops with our mother.  We lived in fruit picker's shacks with no running water or electricity.  Bill and mom would pick until they were exhausted to make enough money to feed us all, as he wasn't yet old enough to hold a regular job.  He and Mom were the sole reason we even made it through these years. . . . Bill took care of our mother from the time he was 16 until her death.  He bought her a home, and paid the expenses for her to live, making sure that one of the family was with her at all times.  When she became bedridden and had totally lost her memory, he paid for all of her care.  When the time came that she passed on, he alone paid the expense of her funeral.  He didn't stop there.  He paid for the care of our sisters, Pauline and Alliene, and our brother, Troy, when they were terminally ill, and paid for their funerals.  He also paid for the funeral of Mel Lambert, our sister Pauline's husband when he passed away.  With each sad event, he made sure that the entire family could get to the funerals and had hotels to stay in, so that we could be there for each of us to say our final good-byes and be there for each other.  Bill has always been there with his support and love or when some member of the family needed financial aid.  There isn't one member of our family that hasn't had him help out with whatever support was needed – financial or otherwise.  Letter from Joe W. Allen, Sr. to Hon. John W. Sedwick.

32

- [W]ithout the influence and support of my brother, Bill J. Allen, I don't think I would have ever been able to live the life that I have been blessed with. At every turn in my life, he has been an[] anchor and a person that helped guide and support my life. He is also the father figure in my life, I know of no other person, in my life, other than my wife and my child that has had a greater influence or enhancement to me. Letter from Roger M. Allen, Jr. to Hon. John W. Sedwick.

- I am aware of the charges to which my Grandfather has [pled] guilty, however this does not change the role he has had in my life nor the love I have for him. When I was small, I would cry every time he left after a visit, as we had a very special connection from the beginning. In fact, some of my earliest memories are of my Grandfather and me, going for a walk, having bubble blowing contests or the inevitable discussion of what I wanted to be when I grew up. He was always encouraging throughout my academic career and would tell anyone who would listen of his granddaughter with the 4.0. After my parents divorced in 1996, when I was eight, my Grandpa became an even more important part of my life. He freed my Mother of . . . all [the] debt my Father had left us in and moved us to Grand Junction, Colorado. Since that time the distance between my Father and I grew and a few years ago I decided to legally take my Grandfather's last name. It is important to me that my college degree says Misty Allen, because without his financial support and the way he has been the father-figure of my life, it wouldn't be possible. Letter from Misty Allen to Hon. John W. Sedwick.

In 1968, after developing an expertise in welding and fitting pipe, Mr. Allen moved to Alaska and entered into business with Wayne Ventrie, starting a company named VE Construction. Shortly thereafter, Mr. Allen bought out Mr. Ventrie's share of the company and renamed its VECO Construction, a company that specialized in oil field services. In 1989, VECO played a vital role in providing services to help clean up Prince William Sound following the Exxon Valdez oil spill. Mr. Allen considered VECO employees to be like family, and he treated them with extraordinary generosity and kindness, including providing the funds for a $40,000 wheelchair to an employee who was paralyzed following a motorcycle accident, and providing no-interest loans to employees in need. See Letter from Thomas Casey to Hon. John W. Sedwick (Sept. 21, 2009) (Exhibit 3); Letter from Lianne Hopper to Hon. John W. Sedwick (Sept. 18, 2009) (Exhibit 3).

In September 2007, Mr. Allen sold VECO, the company he spent 40 years building and maintaining. At the time that Mr. Allen sold his ownership in VECO, the company had over 4,000 employees. To show his gratitude to those employees, Mr. Allen ensured that $15 million of the purchase price was distributed to them.

His personal generosity extended to others including employees, friends, and even those who were strangers. Mr. Allen found joy in helping others in need, whether it was a neighbor, a child, a homeless person, or a politician. Clearly, the crimes to which he pled guilty were an aberration—prior to his actions which led to his guilty plea, Mr. Allen led a law-abiding life full of kindness and charity.

2. <u>Medical Condition</u>

In 2001, Mr. Allen suffered a major brain injury resulting from a motorcycle accident. The accident caused severe brain hemorrhaging which has affected Mr. Allen's verbal expression and auditory comprehension skills. Richard M. Restak, M.D., a neurologist and neuropsychiatrist, examined Mr. Allen in depth and explained that, as a result of the accident, Mr. Allen suffers from aphasia, which affects his verbal expression and "interfere[s] greatly with his ability to communicate and to manage complex sentence structure." Richard M. Restak, M.D., Initial Neurological Examination 2 (Exhibit 5). As a result:

> [Mr. Allen] has considerable difficulty translating verbal and language concepts into workable, understandable responses. He would have difficulty, specifically, if given pieces of information over periods of time, such as several hours, and then being asked detailed questions about these. This would be stressful and stress tends to exacerbate and make worse the type of aphasic and paraphasic errors that Mr. Allen demonstrates.

<u>Id.</u> at 3. Based on his examination of Mr. Allen and the results of a CAT scan, Dr. Restak concluded that Mr. Allen "has significant impairment in terms of handling language, questions,

responding to information, collecting information, and productively encoding a response." Id. at 4.

In addition, Victoria N. Starbuck, Ph.D., a cognitive neuropsychologist, also conducted an extensive examination of Mr. Allen and concluded that he had "[i]mpaired performance on measures of sustained and divided attention, information processing speed, and expressive language functions . . . ." Victoria N. Starbuck, Ph.D., Report of Neuropsychological Evaluation 7 (Exhibit 6). She further concluded "that Mr. Allen performed in the Average to Low Average range on measures of learning and memory, and on measures of central executive functioning that were untimed." Id. Based on a battery of tests, "Mr. Allen's sentence comprehension is at the 6th grade level; his word reading and written arithmetic skills are at the 4th grade level; and his spelling is at the 1st grade level." Id. Additionally, Mr. Allen's intelligence quotient is 82, in the "Low Average range." Id.

Mr. Allen currently suffers from a number of medical ailments, including Type II diabetes, high blood pressure, gout, high cholesterol, an enlarged prostrate, depression, insomnia, acid reflux, and impaired hearing. To control these conditions, Mr. Allen takes a variety of medicines, including insulin, Glyburide, Ramipril, Carvedilol Phosphate, Warfarin, Allopurinol, Lipitor, Flomax, Paxil, Altace, Coreg, Coumadin, Nexium, and Ambien. Mr. Allen also has a pacemaker. See Kathy J. Hurlburt, M.D., Medical History Report (Exhibit 7). His hearing impairment has become so severe in recent years that he must use a hearing aid, although even with the help of the aid, he often has a difficult time hearing conversations and must sometimes read lips. See David D. Beal, M.D., Hearing Examination and Report (Exhibit 8).

Mr. Allen's medical condition should impact his sentence in two ways. First, his cooperation must be qualitatively evaluated in light of his limitations, which Mr. Allen

overcame, with much effort on his part, to provide substantial assistance to the government.
Second, his condition bears directly on the hardship he will face while incarcerated. His
impaired communication skills will create additional burdens on Mr. Allen that other
incarcerated individuals do not have to endure.

3.  Charitable Giving and Public Service

Growing up in poverty and lacking an education, Mr. Allen recognized the importance of
giving back to his community so that others would not face the same disadvantages. See, e.g.,
Letter from Amanda Price, Executive Director, Alaska, American Heart Association, to Tess
Lopez (listing nearly $30,000 in donations from Mr. Allen and VECO over five years) (Exhibit
9); Letter from Harry Need, Development Director, Habitat for Humanity (Oct. 16, 2009) (listing
contributions of over $50,000 over four years from VECO) (Exhibit 9).

As a result, he engaged in exceptional charitable giving, community activities and public
service, and he ensured that VECO and its employees actively participated in giving back to the
community. His charitable giving and community service has occurred over a long period of
time, and substantially pre-dates the conduct to which he pled guilty. Cf. United States v.
Cooper, 394 F.3d 172 (3rd Cir. 2005) (noting that defendant's reduced sentence was based in
part for "good works" and sentence of probation was warranted for defendant's
"exceptional" good works, which included volunteering personal time for community activities
and helping disadvantaged children improve their education and attend college); United States v.
Serafini, 233 F.3d 758 (3rd Cir. 2000) (defendant received reduced sentence based on
"extraordinary and exceptional" community service and charitable works, which included
financial support for medical treatment of a terminally ill patient and mentoring a seriously
injured college student).

United States v. Allen, 3:07-cr-00057-JWS

Mr. Allen made extensive contributions to education and youth development programs for Alaskan children.  He supported and contributed to public and private schools, including providing large direct contributions, providing VECO employees to teach classes, and funding sponsorships, advertising, scholarships, and internships.  For example, when a VECO employee remarked about the lack of an outdoor play area at St. Elizabeth Ann Seton School, Mr. Allen funded the building of a playground.  Throughout the local high schools, Mr. Allen was a major sponsor of Junior Achievement and even personally encouraged one of his employees to be the state treasurer of Junior Achievement and to help these economic programs throughout Alaska.  He also supported Math Counts and Anchorage Youth Court.  Mr. Allen's generosity extended to vocational schools as well; he donated materials and made contributions to King Career Center and Colony High.  Mr. Allen hired four to six drafting interns each year who were recommended by their teachers at various Anchorage area schools.  Once they were 18 years old, the vocational and technical students were hired on as full-time VECO employees.

Mr. Allen strongly believed in college education and generously provided a tuition reimbursement benefit for employees who aspired toward a certificate program, undergraduate, or graduate degrees.  Several employees with only a high school degree eventually earned graduate degrees through this program.  Mr. Allen also supplied scholarships and program support to numerous universities including University of Alaska-Anchorage ("UAA"), Alaska Pacific University ("APU"), and other Alaskan colleges.  The board room at APU was funded by VECO and a road connecting UAA and APU was named "VECO Way" due to multiple large donations.

Other charitable contributions included fully funding the Boy Scout Pavilion, participating in the new Boy Scout Camp, and contributing to the Boys and Girls Club, Brother

Juniper, and Beans Cafe outreach program for the homeless.

Mr. Allen also focused on improving the economic condition of Alaskans, even promoting that stance with VECO's advertising slogan, "We invest in Alaska by hiring Alaskans." This included hiring three dozen Alaskan college students for summer internships. Mr. Allen took a special interest in his own employees as well. When a mother and daughter, both of whom were VECO employees, were killed in an airplane crash, Mr. Allen honored their memory and their devotion to Habitat for Humanity by having a Habitat House built for a family in the Mountain View area. Mr. Allen also extended economic aid to employees by offering personal, no interest loans, and by paying for employees and their children to attend college.[12]

### B.     Seriousness of Offense, Respect for Law, and Just Punishment for the Offense

The sentence imposed must "reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Mr. Allen understands the seriousness of his offense, has accepted full responsibility for his actions, and has done everything asked of him. He has been readily accessible to the government for over three years, treating his duty to cooperate like a full-time job.

When considering just punishment, one must consider the punishment Mr. Allen has already endured. The FBI approached him on August 30, 2006 and questioned him without the benefit of counsel. Cf. United States v. Lopez, 106 F.3d 309, 311 (9th Cir. 1997) (government's misconduct in dealing with defendant without counsel, prejudiced defendant's opportunity for a better plea bargain). Following his agreement to cooperate, Mr. Allen participated in over 70 meetings or debriefings with government prosecutors and FBI agents, and engaged in

---

[12] Additional details regarding Mr. Allen's charitable giving are contained in VECO corporate records that are no longer available to Mr. Allen. Additionally, due to the ownership structure of VECO, approximately 85 percent of any donations by the company were, in essence, donations by Mr. Allen.

United States v. Allen, 3:07-cr-00057-JWS

prearranged meetings with friends and associates while wearing a recording device. He testified in three trials and helped secure three convictions. These tasks were considerably more challenging and stressful given Mr. Allen's medical condition, especially his aphasia which severely affects his ability to communicate effectively.

### C. Adequate Deterrence to Criminal Conduct

The Court's sentence must also "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Mr. Allen has pled guilty to three felony counts of conviction, faces a period of incarceration and a significant fine, and will relinquish certain rights as a result of his felony status. Mr. Allen sold the company he spent his life building and testified against several former friends. His misconduct has been widely publicized in the state and national media (*The Anchorage Daily News* alone has run at least 843 articles about Mr. Allen and VECO since the FBI approached him on August 30, 2006, and the bulk of its reporting and commentary has been extremely negative concerning Mr. Allen; as a cooperating witness, Mr. Allen could not defend himself publicly). Consequently, he has been ostracized from the community in Alaska, a community to which he contributed for 40 years. As noted by Ken Marzocco, a former senior executive at VECO:

> On a personal basis, Mr. Allen has suffered tremendously as a result of his inappropriate behavior. In the 12 years working with VECO, I do not recall Mr. Allen ever taking a vacation; his entire life was dedicated to work and the betterment of Alaska. As a result of the political scandal in Alaska, Mr. Allen has endured immense public humiliation especially with the public release of video tapes and other records. Mr. Allen's health is poor and the stress he has experienced over the past three years appears to have caused his health to deteriorate quickly. Unfortunately I believe any prison sentence will be a life sentence.
>
> I ask that you recognize Mr. Allen's tireless efforts towards the betterment of Alaska and the nation, together with the punishment he has received to date including a loss of the hundreds of millions of dollars, public disgrace and emotional distress. Despite this,

> perhaps his greatest pain is the fact that he has been ostracized
> from the very community he dedicated his life to building.

Letter from Ken Marzocco to Hon. John W. Sedwick (Aug. 31, 2009) (Exhibit 3). The national news media has publicized these circumstances, and the personal consequences to Mr. Allen of his prior conduct carry significant deterrent value. He has been shamed before the community in which he lived and worked most of his adult life, and he suffers from the knowledge that he has brought shame and widespread opprobrium on his family. A harsh sentence is unnecessary to deter similar conduct in the future.

### D. Protect the Public from Further Crimes

The sentence should "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Mr. Allen, now 72 years old, no longer has any active political or lobbying interests. Based on what Mr. Allen has experienced since August 30, 2006, there is absolutely no risk that he will ever commit such misconduct again. Furthermore, defendants "over the age of forty . . . exhibit markedly lower rates of recidivism in comparison to younger defendants." U.S. Sentencing Comm'n, <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u> 12, 28 (2004).

### E. Education or Vocational Training, Medical Care, or Other Correctional Treatment

The Court must consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Mr. Allen's age, medical condition, including neurological condition, and life expectancy all indicate that he should receive a reduced sentence. As noted in the medical reports attached to the Presentence Report, Mr. Allen's sustained health is dependent upon constant monitoring of his diet and exercise routine, and regular medical visits. An extended period of incarceration would put Mr. Allen at risk of

failing to maintain such a lifestyle.  An actuarial analysis of Mr. Allen concludes that he has a

life expectancy between 6.6 and 7.8 years.  Bergstrom Consulting, LLC, Life Expectancy Report

(Sept. 16, 2009) (Exhibit 10).  Thus, any sentence of more than six years would constitute a life

sentence for Mr. Allen.  Additionally, although incarceration presents a heavy burden on any

individual, that burden presents an even greater hardship on Mr. Allen due to his physical,

neurological, and psychological condition.  As a result of his inability to process information

quickly and his inability to find the proper words to express himself, he is likely to experience

difficulty responding quickly to directives or demands while in custody.

### F.  Kinds of Sentences Available

A full analysis of the sentencing factors includes consideration of "the kinds of sentences

available."  18 U.S.C. § 3553(a)(3).  Although a sentence may include incarceration to address

punishment, it may also include sentencing alternatives to address advanced age, life expectancy,

and medical needs.  As the Court is required to consider all seven factors in accordance with §

3553(a), the sentence should include incarceration as well as less restrictive confinement in light

of Mr. Allen's age and health, and to meet the other objectives of sentencing.

### G.  Sentence Disparities

The Court's obligation to avoid unwarranted sentencing disparities requires that Mr.

Allen be sentenced in light of "defendants with similar records who have been found guilty of

similar conduct."  18 U.S.C. § 3553(a)(6).  Mr. Allen's sentence should be consistent with the

treatment of other individuals involved in the same criminal scheme in which he was a

participant, but should also take into account his decision to cooperate with the government's

investigation and to accept responsibility for his own wrongdoing by pleading guilty.  Former

State Representative Kott received a sentence of 72 months and former State Representative

Kohring received a sentence of 42 months.  In each case, the defendant refused to accept

41

responsibility and refused to cooperate. The defendants' status as public servants, sworn "to support and defend the Constitution of the United States and the Constitution of the State of Alaska[] and . . . [to] faithfully discharge [their] duties," ALASKA CONST. art. XII, § 5, makes their illegal conduct deserving of greater punishment than a private individual such as Mr. Allen. Each politician abused a position of public trust.

Mr. Allen, in contrast, accepted responsibility for his actions and actively cooperated with the government in numerous criminal investigations. He was not motivated by personal greed or gain but rather by working to bring the economic benefit of natural resource development and exploitation to all Alaskans. It is appropriate, therefore, under § 3553(a) that a sentence imposed on Mr. Allen be significantly lower than either Mr. Kott's or Mr. Kohring's to avoid "unwarranted sentence disparities."

The Court should also evaluate and give credit for Mr. Allen's cooperation in light of the sentence imposed on William Bobrick. The Court found that Mr. Bobrick's cooperation was timely and that he provided substantial assistance by meeting with the government, wearing recording devices in meetings, and providing key testimony in one trial. As a result of his cooperation, Mr. Bobrick received a five-level reduction to his base offense level.

In comparison, it is clear that Mr. Allen's cooperation has provided a substantially greater level of assistance to the government than Mr. Bobrick, and that Mr. Allen should receive credit commensurate with his level of cooperation. Mr. Allen met regularly with the government for over two years, wore a recording device in multiple meetings, and testified as the key witness at three trials, all of which resulted in convictions. As a result of his cooperation, we respectfully request that Mr. Allen receive a ten-level reduction to his base offense level.

United States v. Allen, 3:07-cr-00057-JWS

A review of the § 3553(a) factors noted above leads to the conclusion that the Court should sentence Mr. Allen below the advisory Guidelines range.

## IV. Mr. Allen Has Extensively Cooperated with the Government on Multiple Investigations, and Is Currently Providing Additional Cooperation.

Mr. Allen's cooperation with the government must be evaluated separately from his advisory Guidelines range and the § 3553(a) factors. As the Guidelines require, the Court must make a determination about the defendant's cooperation based on a factual review of, among other things, "the significance and usefulness of the defendant's assistance . . .; the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; the nature and extent of the defendant's assistance; [and] the timeliness of the defendant's assistance." U.S.S.G. § 5K1.1.

Public policy encourages cooperation, and it is imperative that defendants who provide cooperation receive the proper credit for it. See United States v. Mills, 329 F.3d 24, 32 (1st Cir. 2003) (explaining that a purpose for authorizing departures for substantial assistance is to "encouarg[e] and obtain[] cooperation"). The Court should also consider the impact of a harsh sentence on potential future cooperators. Providing proper credit for substantial assistance and "favoring the grant of sentencing concessions for cooperation [are] undoubted." United States v. Smith, 839 F.2d 175, 183 (3d Cir. 1988) (Becker, J., concurring and dissenting). Encouraging cooperation through such sentencing concessions is "derived from the decades of common experience and understanding of the 'key players' in the criminal justice system—prosecutors, defense lawyers and judges." Id. Mr. Allen should receive proper credit for his substantial assistance to signal to the "key players" in the criminal justice system that future cooperators will receive similar treatment, and to ensure that potential cooperators decide to provide similar assistance knowing that they will receive the appropriate consideration at sentencing.

Through Mr. Allen's extensive cooperation, he has demonstrated his acceptance of responsibility and such actions promote respect for the law. Since the FBI approached Mr. Allen on August 30, 2006, he has accepted full responsibility for his actions and actively cooperated with the government. For more than two years. Mr. Allen voluntarily wore recording devices, met with the government over 70 times, and provided information relevant to investigations of over a dozen individuals.[13]  He testified in three trials, all of which resulted in convictions.

In fact, Mr. Allen is still currently cooperating with the government. Specifically, in relation to ongoing cases, Mr. Allen will be able to provide continued cooperation in the case against former State Representative Bruce Weyhrauch. Also, as a result of the ongoing cases of Messrs. Kott and Kohring, Mr. Allen would be able to provide additional cooperation related to those matters.

Mr. Allen has agreed to cooperate with investigations relating to former U.S. Senator Stevens' trial. Mr. Allen has already met with Mr. Henry F. Schuelke III, an attorney acting on behalf of the U.S. District Court for the District of Columbia, who is investigating potential misconduct by government prosecutors in the case. Mr. Allen's cooperation with the Schuelke investigation must be considered separately from his other cooperation with the government. Mr. Schuelke is not a DOJ employee and the government is not in a position to evaluate or represent to the Probation Office or the Court the extent of Mr. Allen's cooperation. In addition, Mr. Allen's cooperation with the Schuelke investigation cannot yet be fully evaluated because his cooperation is ongoing.

---

[13] Mr. Allen has requested that the government provide <u>Brady</u> information that could more accurately quantify his cooperation in aid of sentencing but, to date, as not received any such information.

<u>United States v. Allen</u>, 3:07-cr-00057-JWS

The DOJ is also conducting an internal investigation through its Office of Professional Responsibility ("OPR"). OPR has contacted Mr. Allen and Mr. Allen intends to fully cooperate with their investigation as well.

Mr. Allen provided this full, truthful, and substantial cooperation while laboring under cognitive, communicative, and medical conditions that made such cooperation physically and mentally more challenging than such cooperation would be for a person in better health. Given the extensive scope and duration of Mr. Allen's cooperation under these circumstances, the amount of consideration Mr. Allen should receive is undervalued if it is merely based on the reported facts used to quantify Mr. Allen's cooperation. Despite his limitations, Mr. Allen provided extensive, truthful, and timely cooperation that has provided the government with relevant information in over a dozen criminal investigations.

## V.    Facility Recommendation

Mr. Allen reserves the right to request that the Court recommend a specific federal detention facility to the Bureau of Prisons at his sentencing hearing.

## CONCLUSION

There is no excuse for Mr. Allen's illegal conduct. In recognition of this fact, Mr. Allen entered into a Plea Agreement and Cooperation Agreement with the government in an attempt to atone for his mistakes. Mr. Allen deeply regrets his actions and cooperated with the government to the best of his ability. As noted above, Mr. Allen's illegal conduct was an aberration. He spent his whole life working to better the lives of everyone he touched, including family and employees, and worked in his community to ensure that others would not have to face the same disadvantages he faced.

Based on these mitigating factors, and on the properly calculated advisory range of 27 to 33 months, Mr. Allen respectfully requests that the Court impose a sentence of 12 months, which should consist of 6 months of incarceration, and the remaining sentence served in community confinement and/or home detention, and a fine of $150,000.

Dated:  October 21, 2009                    Respectfully submitted,

                                            **WHITE & CASE**LLP

                                            ___/s/ George J. Terwilliger III_____

                                            George J. Terwilliger III (D.C. Bar # 956532)
                                            701 Thirteenth Street, NW
                                            Washington, DC  20005
                                            Phone: (202) 626-3628
                                            Fax: (202) 639-9355
                                            gterwilliger@whitecase.com

                                            DORSEY & WHITNEY, LLP
                                            Robert C. Bundy (Alaska Bar # 7206021)
                                            1031 West Fourth Avenue, Suite 600
                                            Anchorage, Alaska 99501
                                            Tele: (907) 257-7853
                                            Fax: (907) 276-4152
                                            bundy.robert@dorsey.com

                                            *Counsel for Defendant Bill J. Allen*

## CERTIFICATE OF SERVICE

I certify that I caused to be electronically filed the foregoing with the Clerk of the Court

of the United States District Court for Alaska by using the CM/ECF system on October 21, 2009.

I certify that all participants in the case are registered CM/ECF users and that service will

be accomplished by the District Court's CM/ECF system.

I further certify that a copy of the foregoing was hand-delivered to the following,

pursuant to D. Ak. LCrR. 32.1(d)(1):

Ms. Karen M. Brewer
U.S. Probation Officer
U.S. Probation Office
168 Federal Building and United States Courthouse
222 West 7th Avenue
Anchorage, Alaska 99513-7500

Date: October 21, 2009                          /s/ George J. Terwilliger III

George J. Terwilliger III (*pro hac vice*)
**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC  20005
Phone: (202) 626-3628
Fax: (202) 639-9355
gterwilliger@whitecase.com

*Attorney for Defendant Bill J. Allen*

**WHITE & CASE** LLP

George J. Terwilliger III (*pro hac vice*)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3628
Fax: (202) 639-9355
gterwilliger@whitecase.com

DORSEY & WHITNEY LLP
Robert C. Bundy (ABA # 7206021)
1031 West Fourth Avenue, Suite 600
Anchorage, Alaska 99501
Tele: (907) 257-7853
Fax: (907) 276-4152
bundy.robert@dorsey.com

*Attorneys for Defendant Bill J. Allen*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:07-cr-00057-JWS |
| v. | **EXHIBITS TABLE OF CONTENTS DEFENDANT BILL J. ALLEN'S MEMORANDUM IN AID OF SENTENCING** |
| BILL J. ALLEN, | |
| Defendant | |

Pursuant to D. Ak. LR 10.1(c)(2), the following exhibits are attached to Defendant Bill J.

Allen's Memorandum in Aid of Sentencing:

Exhibit 1: Letter from Edward Nucci, Acting Chief, Public Integrity Section, to Robert Bundy (Aug. 31, 2006).

Exhibit 2: Defendant Bill J. Allen's Stipulated Facts (May 2, 2007).

Exhibit 3: Letters in Support of Defendant Bill J. Allen

Exhibit 4: Video DVD in Support of Defendant Bill J. Allen

<u>United States v. Allen</u>, 3:07-cr-00057-JWS

Exhibit 5:     Richard M. Restak, M.D., Initial Neurological Examination

Exhibit 7:     Victoria N. Starbuck, Ph.D., Report of Neuropsychological Evaluation

Exhibit 8:     David D. Beal, M.D., Hearing Examination and Report

Exhibit 9:     Letters Regarding Charitable Donations

Exhibit 10:    Bergstrom Consulting, LLC, Life Expectancy Report


Dated:  October 21, 2009                    Respectfully submitted,

                                            **WHITE & CASE** LLP

                                            _____/s/ George J. Terwilliger III_____

                                            George J. Terwilliger III (*pro hac vice*)
                                            701 Thirteenth Street, NW
                                            Washington, DC  20005
                                            Phone: (202) 626-3628
                                            Fax: (202) 639-9355
                                            gterwilliger@whitecase.com

                                            DORSEY & WHITNEY LLP
                                            Robert C. Bundy (ABA # 7206021)
                                            1031 West Fourth Avenue, Suite 600
                                            Anchorage, Alaska 99501
                                            Tele: (907) 257-7853
                                            Fax: (907) 276-4152
                                            bundy.robert@dorsey.com

                                            *Attorneys for Defendant Bill J. Allen*