UNITED STATE DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,    .    Case 3:07-cr-00057-JWS
                             .
     Plaintiff,              .    Anchorage, Alaska
                             .    October 28, 2009
vs.                          .    8:30 o'clock a.m.
                             .
BILL J. ALLEN,               .    **IMPOSITION OF SENTENCE**
                             .
     Defendant.              .
  . . . . . . . . . . . . .  .

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          JAMES M. TRUSTY, ESQ.
                            U.S. Department of Justice, Criminal
                                 Division
                            950 Pennsylvania Avenue NW, Suite 6746
                            Washington, D.C.  20530
                            (202) 307-0207

                            KEVIN R. GINGRAS, ESQ.
                            U.S. Department of Justice, Criminal
                                 Division
                            950 Pennsylvania Avenue NW, Suite 1264
                            Washington, D.C.  20530
                            (202) 305-7983

                            PETER M. KOSKI, ESQ.
                            U.S. Department of Justice, Criminal
                                 Division
                            1400 New York Avenue NW, 12th Floor
                            Washington, D.C.  20005
                            (202) 307-3589

For the Defendant:          GEORGE J. TERWILLIGER III, ESQ.
                            White & Case LLP
                            701 Thirteenth Street NW
                            Washington, D.C.  20005
                            (202) 626-3628

```
 1    APPEARANCES (Continued):

 2                                ROBERT C. BUNDY, ESQ.
                                  Dorsey & Whitney, LLC
 3                                1031 West Fourth Avenue, Suite 600
                                  Anchorage, Alaska   99501
 4                                (907) 276-4557

 5    Probation Officer:         KAREN BREWER
                                  U.S. Probation/Pretrial Service
 6                                222 West Seventh Avenue, #48
                                  Anchorage, Alaska   99513
 7                                (907) 271-5494

 8    Court Recorder:            SAMANTHA LARK
                                  U.S. District Court
 9                                222 West Seventh Avenue, #4
                                  Anchorage, Alaska   99513
10                                (907) 677-6118

11    Transcription Service:     TERESA MIELKE
                                  T M Transcribing
12                                1980 Commodore Drive
                                  Anchorage, Alaska   99507
13                                (907) 277-8591

14    Proceedings recorded by digital sound recording, transcript
      produced by transcription service.
15

16

17

18

19

20

21

22

23

24

25
```

1        **ANCHORAGE, ALASKA - WEDNESDAY, OCTOBER 28, 2009**

2           (Defendant present)

3     (Log 8:30:52)

4           THE CLERK:  -- District of Alaska is now in session,

5     the Honorable John W. Sedwick presiding.  Please be seated.

6           THE COURT:  Good morning.

7           ALL COUNSEL:  Good morning, Your Honor.

8           THE COURT:  We're here this morning for proceedings in

9     an Anchorage criminal case, it's Number 3:07-cr-57, United

10    States versus Bill J. Allen.  We're here for a sentencing

11    proceeding but first I need to address a preliminary matter.

12         The defendant filed a motion at Docket 70 to declare the

13    United States in breach of the plea agreement.  After reviewing

14    the motion I filed a written order which denied it insofar as it

15    was based on an improper use of the information in a document

16    called "The Factual Statement," which is part of the plea

17    agreement in this case.  I left open the possibility that the

18    motion might have merit based upon the proffer letter authored

19    by Nicholas Marsh, one of the U.S. attorneys previously

20    prosecuting this case.  I asked the United States to file a

21    response.

22         I have now read the United States's response on that issue

23    and agree with the United States's arguments contained in their

24    pleading at Docket 83.  I conclude that the plea agreement

25    contract between Allen and the United States supersedes any

Case 3:07-cr-00057-JWS   Document 87   Filed 11/02/09   Page 3 of 69

1    other or different understanding that could be -- could possibly

2    be derived from the proffer letter, a document which, were it to

3    have any bearing on Allen's plea contract, should have been but

4    was not presented in writing to the court at the time the court

5    acted at the change of plea hearing.  So the remainder of the

6    motion at Docket 70 is denied.

7        We're here because Mr. Allen pled guilty pursuant to a plea

8    agreement to one count of conspiracy to commit extortion under

9    color of official right, bribery and honest services fraud in

10   violation of 18 United States Code Section 371.  He also pled

11   guilty to one count of bribery concerning programs receiving

12   federal funds in violation of 18 United States Code Section

13   666(a)(2) and one count of conspiracy to impair and impede the

14   Internal Revenue Service in violation of 18 United States Code

15   Section 371.

16       A presentence report has been prepared and no information

17   was withheld from that report.  Mr. Allen, did you read the

18   presentence report?

19            THE DEFENDANT:  I'm sorry?

20            THE COURT:  Did you read the presentence report?

21            THE DEFENDANT:  Yes, it was in -- I think -- what was

22   that?  Oh, yeah, I have, I have, I have, Your Honor, I'm sorry.

23            THE COURT:  All right, and did you discuss it with

24   your lawyers?

25            THE DEFENDANT:  I'm sorry?

1    THE COURT:  Did you discuss that report with Mr. Bundy

2  and your other lawyers?

3         THE DEFENDANT:  Yes.

4         THE COURT:  I've read the presentence report and the

5  parties' sentencing materials, including the numerous letters of

6  support from Mr. Allen's family and friends and documents from

7  several doctors who have examined him or reviewed his medical

8  records.  Based on that information and more, as explained in my

9  order at Docket 72, I have already accepted the plea agreement.

10 When determining the sentence to be imposed I will consider the

11 factors specified in 18 United States Code Section 3553(a),

12 which requires that I make findings of fact for use in this

13 proceeding.  Many of the facts are set out in the presentence

14 report, however there have been some objections to the

15 presentence report.

16    The most significant objection to the presentence report

17 made by the defendant was his objection to reliance in the

18 presentence report on the factual basis.  If this objection had

19 merit, it would have reduced Mr. Allen's guideline offense

20 category by 12 levels and had a dramatic impact on his guideline

21 sentencing range.  However, the objection lacks merit.  My

22 orders at Dockets 72 and 73 and the ruling I just announced

23 concerning the proffer letter have resolved that objection

24 against Mr. Allen.  The factual basis has been properly

25 considered in the presentence report so defendant's objections

1    to Paragraphs 103 through 108 of the presentence report are

2    overruled.

3        The defendant has made two other objections that could have

4    a significant effect on his guideline advisory sentencing range.

5    One of them is his objection to the use of guideline section

6    2C1.1 relating to bribes rather than guideline 2C1.2 relating to

7    unlawful gratuities as set out in Paragraph 101 of the

8    presentence report.  If Allen is correct, the consequence would

9    be that his guideline offense category would be adjusted upward

10   for the amount of money involved in these crimes by only nine

11   levels instead of 12 levels.

12       The other objection is to the four-level upward adjustment

13   for his role in the offense set out in Paragraph 113 of the

14   presentence report.  This objection implicates Paragraphs 111

15   through 113 of the presentence report.  I will hear argument on

16   these significant issues in a few minutes.

17       First I would like to address some additional points.  Both

18   parties objected to leaving a discussion of the case of the

19   United States versus James Clark in the relevant conduct section

20   of the presentence report.  However, I agree with the author of

21   the report that Mr. Clark is bound up in the conspiracy

22   regarding the PPT and therefore it belongs in the presentence

23   report as relevant conduct.  So the parties' objections on that

24   point are overruled.

25       While the presentence report includes information about

charges against former Representative Beverly Masek and former
United States Senator Ted Stevens, as well as an investigation
regarding United States Representative A, that information is
not part of the relevant conduct and will not be considered as
such in this sentencing proceeding. Because I will not rely on
that information in exercising my sentencing discretion, there
is no need to address this objection any further.

Mr. Allen objects to the inclusion of information which
relates to a scheme from the 1980s in which he was involved in
reimbursing Veco employees for contributions made to political
candidates. This information is reliable and I consider it
relevant to understanding the history and characteristics of the
defendant. So that objection is overruled.

With the exception of Paragraph 101 relating to the use of
guideline 2C1.1 and Paragraphs 110 -- or, rather, 111 through
113 relating to Mr. Allen's role in the offense, I find that all
of the other factual statements in the presentence report are
supported by a preponderance of reasonably reliable evidence. I
adopt them and make them my findings of fact for purposes of
this proceeding.

All right, at this time I'd like your argument on the issue
of whether we should use guideline section 2C1.1, which applies
if the payments made were bribes, rather than guideline 2C1.2,
which applies if the payments made were gratuities paid to
generally influence the public officials involved. My

1    preliminary view is that the guideline for gratuities applies.

2    This issue is only relevant to Counts 1 and 2 and Count 1

3    predominates for sentencing purposes, so it is the one upon

4    which I think attention should be focused.

5        With respect to Count 1, the lion's share, indeed the vast

6    majority of the money involved, is found in the series of large

7    payments made to State Senator B.  My preliminary view is that

8    there is insufficient evidence to show that the series of

9    payments were made in -- was made in exchange for specific acts.

10   Rather the payments appear to have been made over an extended

11   period to insure that in general and in the long run State

12   Senator B would support positions favorable to Veco and its

13   customers.  Absent evidence that the payments were made in

14   exchange for performance of specific acts, the payments to State

15   Senator B would be illegal gratuities but not bribes.  Even

16   accepting the proposition that the payments to Kott and Kohring

17   were bribes would not alter the outcome because those payments

18   represent a very small portion of the total amount of money

19   involved.

20       Now, as I say, that's my preliminary view.  I will hear

21   from the parties on this matter.  Given my preliminary view, I

22   would like to hear from the government first, and then I'll hear

23   from Mr. Allen's lawyer.

24       MR. TRUSTY:  Good morning, Jim Trusty, Peter Koski and

25   Kevin Gingras on behalf of the United States.  Good to see you

1    again. Your Honor, on the bribe versus gratuity issue we would

2    submit that there's nothing unreasonable or irrational about the

3    way the court is approaching it, and I'm not sure that I'll have

4    any golden advice in terms of factual moments that dispel the

5    court's initial notions, but I would point out a couple of

6    things. And I guess the first is, the most fundamental, is that

7    Mr. Allen has pleaded guilty to bribery-based offenses, at least

8    for the two relevant counts that we are concerned with. There's

9    nothing in the elements of the offense that refer to gratuities,

10   there's nothing in the statement of facts that establishes

11   gratuities. And I would submit that, conversely, the statement

12   of facts that the court has now seen fit to be considered as

13   part of the sentencing includes language that establishes quid

14   pro quo.

15       The gratuity is typically a more, I guess, diffuse form of

16   criminal payment or typically an after-the-fact type of payment,

17   an acknowledgement of receipt of some sort of corrupt official

18   act, for instance. A bribe is more of a reverse chronology. A

19   bribe is --

20          THE COURT: Let me ask you this. Would you focus on

21   the payments to State Senator B because I think that drives the

22   decision here. I'm not sure that there's anything in the

23   factual basis that shows that those were bribes. Now, I agree

24   there's enough in the factual basis to support the convictions,

25   but what is it that shows that those payments to that particular

1    state senator were for specific acts?

2           MR. TRUSTY:  Your Honor, I would submit that Paragraph

3    24 of the statement of facts on the seventh page would be the

4    most operative paragraph in regards to characterizing the

5    payments to State Senator B, and particularly as we get to the

6    end.  Again, there's a chronology to it, which is -- within this

7    plea agreement, which is describing the fact of payments and

8    then describing what is received in return.  And I admit that it

9    is less specified than in some of the other instances where you

10   talk about 20/20 PPT legislation and unbottling legislation from

11   chambers and things of that nature that appear through the PSR.

12   But it does in fact indicate that these were payments provided

13   in exchange for -- and I think that's a key characterization

14   here, in exchange for giving advice, lobbying colleagues and

15   taking official acts.  I would submit to the court that the

16   presentence report accurately includes that because, again, this

17   is not -- the bribe doesn't have to be -- the fact of bribery

18   doesn't have to be exclusively wedded to a single issue before

19   the legislature.

20       I would submit that the court's characterization that this

21   is more of a -- kind of a standing retainer circumstance where

22   Veco and Mr. Allen can expect beneficial treatment by going

23   through this process year after year -- And obviously the amount

24   of years supersedes or extends beyond the timing of the 24th

25   Legislature.  But I would submit to the court that within that

1    time frame are official acts and official bribes taking place

2    that relate to Veco's interests which, particularly in this

3    period of 2006, related to the PPT 20/20.

4        If I could just have one moment to consult with my co-

5    counsels.

6            THE COURT:  Certainly you may.

7            MR. TRUSTY:  The only other point I would make, Your

8    Honor, in terms of kind of the materiality of this

9    classification -- I know we're talking about different base

10   offense levels depending on whether it's characterized as a

11   bribe --

12           THE COURT:  We're talking about different adjustments

13   to the base offense level.

14           MR. TRUSTY:  Okay.  Well, and I apologize, that's

15   right, it's beyond the next -- it's the second step.  But I

16   believe that since each of these guidelines is going to be

17   grouped together ultimately, if there's some component of bribes

18   and some component of gratuities, and under 2B1.1 if we're

19   treating all of the financial contributions as relevant criminal

20   conduct, then at the end of the day I would submit to the court

21   it may end up at the same guideline range anyway because some

22   component starts with the adjustment for bribes and some start

23   with the adjustment for gratuities, but the cross application

24   would lead to essentially 2C1.1 trumping.

25           THE COURT:  Well, I have a little trouble following

Case 3:07-cr-00057-JWS   Document 87   Filed 11/02/09   Page 11 of 69

1    that.  I mean, do you not agree that it's Count 1 that drives

2    the sentencing decision here?  It's the more serious.

3              MR. TRUSTY:  It is.

4              THE COURT:  And that's the one I'm wrestling with

5    trying to determine if -- and for that matter, with respect to

6    Count 2, which is the only other one as to which this applies,

7    it's much less serious.  I believe it carries a maximum penalty

8    of five years and Count 1 carries a maximum penalty of 10 years.

9              MR. TRUSTY:  I think that -- Your Honor, I believe,

10   and I'm looking to my co-counsel, I think it's the Hobbs Act is

11   the 10 years, Count 2, and the first count as a 371 conspiracy

12   is the five.

13             THE COURT:  I may have them mixed up.  Is that

14   correct?

15             MR. TRUSTY:  I think it's the flip of that.

16             THE COURT:  All right, so it's considered the more

17   serious crime.  However, here the guideline Appendix A itself

18   directs the court to use either 2C1.1 or 2C1.2 without any

19   explanation of why.

20             MR. TRUSTY:  Right.  I just think, Your Honor, if you

21   end up acknowledging that some component of that benefits amount

22   is -- constitutes bribes and some component -- and I don't think

23   there's a perfect amount of surgical precision needed here.

24   There's some component is bribes and some component is

25   gratuities.  You essentially treat each as relevant conduct for

1    each other.  Break it into two groups starting with the 10 --

2    or, with the 10 and a 12, and then ultimately, again, because of

3    2B1.1's operation, the overall loss amount, or in this case

4    benefits amount, is grouped, which would mean that the higher

5    grouping that begins with the bribery adjustment controls.  I'm

6    probably not explaining that in the most articulate way we can

7    imagine here, but I'm just suggesting to the court that I think

8    the guidelines' cross application in some ways renders this

9    process moot as long as there's some combination of bribery and

10   gratuity going on.

11        THE COURT:  So it's your view that the grouping of the

12   two -- the grouping of -- Actually what we're grouping here are

13   two counts for which this is relevant, Counts 1 and 2, and then

14   the IRS count that has no bearing on it.

15        MR. TRUSTY:  Right, and I can make short shrift of

16   Count 3 in terms of the guidelines whenever the court wants to

17   hear about it, but, yes, with the distinction that the court is

18   now making compared to the probation report, we would

19   effectively be creating two groups and then comparing the

20   adjustments to those groups but ultimately coming back to a

21   single predominant group, which would be the bribery-based

22   group.

23        THE COURT:  Well, it certainly is Counts 1 and 2.

24        MR. TRUSTY:  Correct.

25        THE COURT:  And the issue, though, is which guideline

1    we need to use given that there may have been some bribes but

2    the overwhelming -- at least in my view the overwhelming payment

3    here was to State Senator B.  That's where most of the money is.

4              MR. TRUSTY:  Certainly.

5              THE COURT:  And it seems a little troubling to me to

6    use payments that were only a small portion of that to drive the

7    sentencing decision.  But I think I understand your position.  I

8    do need to hear from Mr. Allen's lawyer at this point.

9              MR. TRUSTY:  Thank you, Your Honor.

10             THE COURT:  Thank you, Mr. Trusty.  Mr. Bundy.

11             MR. BUNDY:  Thank you, Your Honor.  For the reasons

12   stated in our sentencing memorandum we believe that the court is

13   correct in characterizing -- your tentative decision to

14   characterize these as gratuities because, as you pointed out

15   just a moment ago, it's -- to let a small tail of the smaller

16   amount that could be characterized as bribes wag the greater

17   amount, which is the large adjustment as a result of amount,

18   results in injustice.  The court is given the ability to choose

19   under the guidelines which of these guidelines the court wishes

20   to utilize to calculate the guideline range, and to use --

21   there's a huge difference here in the three levels.  At the

22   amount that the court has indicated in terms of dollar amount

23   that the court is going to follow, when you have a 10- or 12-

24   level upward adjustment based on amount, if the largest part of

25   that amount is a gratuity, then to start off at the bribe

amount, which is a level 12 instead of a level 9, changes

dramatically the ultimate guideline range under the way the

guidelines are sentenced.  As it goes up the ranges get larger

and the time gets significantly more.  There's -- For an amount

that when you have a guideline range that that's dramatically --

that is changed dramatically like that, the court must find by

clear and convincing evidence that -- that the higher applies

under Ninth Circuit law, so we submit that the factual basis is

ambiguous in that regard.  It doesn't state it -- I mean, what

we're talking about here is a -- allegations of payments over

eight -- seven -- six years, and then only at the very end do

they claim -- does the -- without identifying any particular

transaction, that there's some sort of a -- that the bribe

characterization ought to apply to all of it when they've

offered no evidence of that whatsoever, much less clear and

convincing evidence.

        THE COURT:  All right, thank you, Mr. Bundy.

        MR. BUNDY:  Your Honor, I --

        THE COURT:  No, I'm going to rule in your favor, you

don't need to say anything further.  In addition to what I said

previously, there are a couple additional comments that need to

be made.  First I disagree with Mr. Bundy that for a three --

for a difference of three levels I need to find support by clear

and convincing evidence.  I think all that's required is the

preponderance of the evidence.  But I don't think that even by a

1  preponderance of the evidence here there's been any showing that
2  the payments to State Senator B were bribes.  Now, they may have
3  been, but I don't have the evidence to show it.

4      What I do have in the factual basis is a recitation of
5  payments made in 2002, 2003, 2004, 2005 and 2006.  It's in 2006
6  that the PPT legislation was being considered and for which
7  there may have been bribes paid.  But the amount of money in
8  2006 is the smallest amount of money that was paid to State
9  Senator B over the entire period.  So under all of the facts and
10  circumstances and bearing in mind another principle of the Ninth
11  Circuit jurisprudence, which is that when the application of an
12  adjustment is ambiguous the court is required to apply the more
13  lenient adjustment based on what's known as the rule of lenity,
14  so following that precedent in view of what I consider to be
15  inadequate proof, I'm going to use guideline two section --
16  guideline 2C1.2.  As Mr. Bundy has pointed out, the net
17  difference is three levels in determining Mr. Allen's guideline
18  sentencing category.

19      All right, that means that the --
20          MR. TRUSTY:  Your Honor, just for the record could the
21  record reflect our objection to that calculation?
22          THE COURT:  Yes, sir, it will, and of course we're far
23  from done with this proceeding.  You and Mr. Bundy will have
24  ample opportunity to address the court.
25          MR. TRUSTY:  Understand.

T M Transcribing . 1980 Commodore Drive . Anchorage, Alaska  99507 . (907) 277-8591

1          THE COURT:  All right, so that means that the

2     objection to Paragraph 101 in the presentence report is

3     sustained.  Now, at this time I need to hear argument regarding

4     the role in the offense.  Again I'll give you my preliminary

5     view, which relies, among other things, on evidence from sources

6     not Mr. Allen's testimony but other evidence in the Kott and

7     Kohring trials, particularly on the videotapes of activities in

8     Suite 604.  And looking at all of the evidence, including in

9     particular that evidence, I think the role adjustment is

10    correct.  That being so, I'll hear from Mr. Bundy and then from

11    the government.  Mr. Bundy.

12         MR. BUNDY:  Thank you, Your Honor.  Your Honor, the

13    role adjustment, in order to -- as said in the presentence

14    report, requires a four-level as an organizer or leader of five

15    or more people.  I think what we saw both in the Kohring and

16    Kott proceedings, as well as the -- as well as what was

17    contained in the presentence report, indicates that Mr. Allen

18    really wasn't an organizer of much of anything.  What occurred

19    in Suite 604 and in other places was more or less people

20    approaching Mr. Allen asking for favors.  There was no necessary

21    organization of we will give this money to this person, we'll

22    give that money to that person in order to do any organizing.

23    There was no --

24         THE COURT:  Are you telling me there was no

25    organization in an attempt to defeat the PPT?  Are you telling

1   me there was no strategy?

2         MR. BUNDY:  There was an organization and a strategy

3   but in terms of the illegal --

4         THE COURT:  Well, that was illegal.

5         MR. BUNDY:  The -- it's not illegal to have a

6   strategy --

7         THE COURT:  Carried out in the way in which this was

8   carried it was.

9         MR. BUNDY:  But the question is is whether the

10  strategy itself contemplated that it would be carried out in

11  this way.  There was a strategy about talking to legislators and

12  trying to get people to agree with one side -- with the 20/20

13  side of the tax and the PPT issue, and that was the strategy and

14  that was -- and lobbyists do that all the time.  I mean, people

15  are spending billions of dollars in Washington now on the health

16  care for strategy and working things.  And the amount of money

17  that was used here is like almost lunch money compared to what's

18  being spent every day for strategy.

19      The question is is what happened, we contend, in this

20  situation was because Mr. Allen -- because of his obvious desire

21  to have the 20/20 PPT pass, he passionately believed that that

22  was the right way that Alaska should go, everybody knew that.

23  They also knew Mr. Allen's history of generosity to others in

24  all areas of his life was spectacular.  He was a sitting duck

25  for people that wanted to approach him and use their office to

1    gain personal gain.  And when they came to him he responded to

2    them.  He didn't decide to go to them.

3        If you'll look at every single thing, it was Kohring who

4    said I want -- I have to call up and approach Mr. Allen for

5    $17,000.  It was Mr. Kott who approached Mr. Allen asking for

6    the money for his son's -- to pay his son during the campaign.

7            THE COURT:  What about the six years of payments to

8    State Senator B?

9            MR. BUNDY:  Well, State -- there wasn't even a PPT or

10   pipeline legislation until --

11           THE COURT:  I realize that --

12           MR. BUNDY:  -- the very end.

13           THE COURT:  -- but doesn't that give us some insight

14   into what was going through Mr. Allen's mind and what he was

15   attempting to do?

16           MR. BUNDY:  If there was -- there are a number of the

17   payment -- according to the Alaska Attorney General's opinion,

18   it is not illegal for a legislator to have a job and for people

19   to pay a legislator for -- to have -- to be on retainer or

20   otherwise give advice.  That's not illegal.  And so all of those

21   times he could do that legally, to pay somebody for -- to be on

22   a retainer for him.  There was nothing illegal necessarily about

23   that.  Now, whether that was part of a organization, it -- to

24   pass the PPT, it predated -- the State Senator B was on the Veco

25   payroll long before he ever became a legislator at all, since

1   1995, performing -- giving advice, being on the payroll, being

2   available for consultation when necessary.  And there's nothing

3   wrong with that.

4        So to say that this was -- that Mr. Allen was an organizer

5   under these circumstances I believe is way overstating what his

6   role was.  It was -- sure, he wanted PPT 20/20 to pass, he made

7   no secret of that and he tried to -- tried to get people to go

8   along with it and lobby and -- and they hired lobbyists, they

9   hired all kinds of people to help get that done.  But the actual

10  illegal activity occurred a result of solicitations made by

11  others, not by Mr. Allen.  Mister -- the evidence, nowhere does

12  it show that Mr. Allen ever once solicited anybody.  They came

13  to him and asked.  He didn't organize them, they knew that he

14  was vulnerable and -- because of how much he wanted this thing,

15  and they came to him.

16       So therefore it seems to us that there -- in terms of the

17  illegal activity there really was no organization of it.  It was

18  serendipitous as it occurred.

19            THE COURT:  Thank you, Mr. Bundy.  Mr. Trusty.

20            MR. TRUSTY:  Well, Your Honor, I would submit to the

21  court that the probation determination that four levels is

22  appropriate here is fairly borne out by the facts, and certainly

23  far in excess of a preponderance of evidence.  The question

24  before the court essentially is whether Mr. Allen was a leader

25  or an organizer of a corrupt scheme to affect the legislature

1   and to affect the passage of the 20/20 PPT.  I don't think

2   there's any challenge that's being made here as to the scope

3   part of that, which is the five or more participants.  I'll

4   address that fleetingly in a second.

5           THE COURT:  Well, there -- I'm not aware of -- clearly

6   there were more than five, but I'll let you go ahead and address

7   it if you --

8           MR. TRUSTY:  Really, if not for anything else but

9   record-building I'll rattle off some components to that.  I

10  think what Your Honor appropriately looks at at this juncture is

11  really the actions of Mr. Allen as the court knows them and how

12  -- and really how others treated him.  I think that's reflective

13  of a leadership position as well.  And I think it's clear from

14  the litigation that's been before this court, not relying on Mr.

15  Allen's testimony, but on recordings, on Rick Smith, on

16  defendant testimony, that repeatedly in this case you've got a

17  person who is in charge of doling out money, doling out

18  promises, doling out favors, doling out all sorts of benefits to

19  try to guide the legislature in a corrupt fashion.

20      And the way others treat Mr. Allen is critical to this

21  analysis as well, Your Honor.  When you have individuals who sit

22  there and report repeatedly to Mr. Allen here's what I'm doing

23  to help the legislation, here's what I'm doing to bottle up some

24  other bill or to unbottle some other bill, when you've got

25  individuals whom Mr. Allen can look in the eye and say I own

your hindquarters, that says something about that relationship. And again, normally in -- I think in most circumstances an elected political official with some kind of built-in gravidas with that position wouldn't be talked to that way very often. But it's reflective of the role that he had.

And when you talk about two points versus four, we'll acknowledge the original nonbinding estimate of the government mentioned two points for the role adjustment. I don't really know the thinking in 2007 of exactly how that came to be. I would note --

THE COURT: But in any event it's nonbinding.

MR. TRUSTY: Nonbinding. I would also note that the government in looking at that nonbinding estimate now also walked away two levels from another component, so it's not that there's some, you know, violence to the conscience in terms of that nonbinding estimate being put forward. But being a manager, if the court were inclined to go with the two-level adjustment, in many ways -- not necessarily absolutely, but in many ways would suggest that there is someone higher than the manager, that there's the owner or the leader. And there's just no one that fits that role in this case other than Mr. Allen.

Mr. Allen is not a, quote, average participant, which is what the defense is essentially asking this court to find by not having any form of role adjustment. I know it seems to be modified to a two-level now, but there's really -- Factually in

1    this case there's really not much of a middle ground between no

2    role adjustment and four because clearly the scope of the scheme

3    covers the five participants.

4         I'd just note the statement of facts makes that very clear.

5    You would include Mr. Allen, Mr. Smith, State Representatives A

6    and B, State Senators A and C, and I think from the court's

7    ruling this morning Mr. Clark could be a component of that as

8    well.  So we're certainly in excess of five participants.

9         As to State Senator B, the only thing I would mention about

10   the focus on that from the defense allocution a moment ago is

11   the conduct -- the payments between 1995 and 2001, I guess it

12   is, are not part of the statement of facts as criminal conduct.

13   They're -- we're not seeking that inclusion as some form of

14   relevant criminal conduct.  But the fact of the matter is

15   payments -- although consultation itself is not illegal,

16   payments when it is basically a sham are.  And that's why that's

17   in the statement of facts, that's why that provides a basis for

18   guilt in this case, as well as for guideline calculations,

19   whether gratuities or bribes or some combination, as the

20   government would suggest at this juncture.

21        So, Your Honor, I would submit to the court that when you

22   have individuals who look Mr. Allen in the eye and are told that

23   they're owned by Mr. Allen, when you have Mr. Allen

24   orchestrating communications and payments and promises across

25   the board as really the center of a wheel conspiracy in terms of

1    his role, that there's really no one that is higher than him,
2    then it's not inappropriate at all to consider this a four-level
3    adjustment as both, really, some combination of leader and
4    organizer.

5              THE COURT:  Thank you.  I think it's clear that under
6    the -- with the evidence that's available to the court that Mr.
7    Allen was the leader or organizer of this conspiracy.  As Mr.
8    Trusty points out, certainly no one else could have been, and,
9    more importantly, I think, the way in which Mr. Allen's -- Mr.
10   Allen was treated, the way in which others deferred to him shows
11   that he was in fact the leader and organizer.  It may be
12   correct, as Mr. Bundy suggests, that some of these minions knew
13   how to take advantage of Mr. Allen.  But they could do that in
14   large measure only because he had this overriding concern that
15   he wanted to be sure that the legislation that was passed was
16   the kind of legislation that would put hundreds of millions if
17   not billions of dollars in his clients' pockets, a significant
18   portion of which would then be returned to him through Veco.

19       So I find that he was the leader and organizer.  As Mr.
20   Trusty points out, there's clearly no doubt that there were at
21   least five people participating in this conspiracy, and so that
22   is enough to make it -- to make the four-level adjustment
23   appropriate.  And let me also indicate that I disagree again
24   with the argument in Mr. Bundy's brief that this particular
25   adjustment would have to be proved by clear and convincing

1    evidence.  However, let me state for the record that if it does

2    need to be proved by such evidence, I do find the evidence clear

3    and convincing.

4        Now, based on my findings of fact the advisory guideline

5    range is a Level 28 with a criminal history category of I, which

6    would establish an advisory sentencing range of from 78 to 97

7    months of incarceration.  Of course this is before considering

8    the motion for downward departure filed by the United States at

9    Docket 66.  I have reviewed the motion papers and Mr. Allen is

10   entitled to a downward adjustment in the guideline range

11   pursuant to guideline section 5K1.1 because all five of the

12   requirements have clearly been met.  I would like to hear from

13   counsel for both parties as to the extent of the departure from

14   the range of 78 to 97 months which would be appropriate in the

15   absence of the motion.  In addressing this issue please remember

16   that I am not asking you to speak to all the issues that are

17   relevant under 18 United States Code Section 3553(a).  You'll

18   have an opportunity to address that later.  I want you to limit

19   your comments to those things that are pertinent to guideline

20   section 5K1.1.  It's the government's motion so we'll hear from

21   you first, Mr. Trusty.

22        MR. TRUSTY:  Thank you, Your Honor.  Your Honor, in

23   large measure we'll adopt the motion that we filed with the

24   court because it in fact goes beyond justifying the mere

25   threshold of making the motion, at least as the court has now

1   found, and addresses really the scope of Mr. Allen's

2   cooperation.  In terms of just highlighting some aspects of that

3   pleading I would submit to the court that it's really

4   undisputed, and I'm sure counsel will echo me momentarily on

5   this, that Mr. Allen made an immediate decision back in August

6   of 2006 upon confrontation by law enforcement to cooperate, and

7   that he has in fact cooperated in depth repeatedly both in kind

8   of historical fashion and a proactive fashion to assist the

9   government in a very important investigation into public

10  corruption.  This is a situation where Mr. Allen has testified

11  on three occasions under oath subject to cross examination, he

12  has made himself available repeatedly through this process,

13  including something in the neighborhood of 70 or 71, maybe,

14  consultations, interviews, debriefings, whatever phrase we

15  should use for that.  He has consented and participated in

16  consensual recordings that were -- formed important evidence in

17  the investigations and cases that the court is aware of.  And

18  he's even allowed for closed circuit television monitoring

19  within his own home on I think about 11 occasions, if I remember

20  our memo correctly.

21       This is a circumstance where clearly Mr. Allen from the

22  government's perspective is worthy of this motion and we've

23  submitted to the court -- and again, it's in a little bit of a

24  vacuum in terms of the final guideline calculations under this

25  plea agreement that the court has made, but we stand by our

1    recommendation of an eight-level departure.  That gives some

2    general, at least, acknowledgment to the prevailing practice in

3    this district when it comes to cooperation being somewhat wedded

4    to -- again from our original calculations, wedded to a 50%

5    reduction from the bottom of the applicable guideline before the

6    5K1.1.  We think it actually goes a little beyond that 50%

7    notion, particularly now with the court making the finding on

8    the gratuities, but we think eight levels is appropriate.  That

9    is something that we believe reflects the depth of the

10   cooperation that Mr. Allen provided.

11       As Your Honor is well aware, in conspiracy cases what makes

12   them successful as criminal ventures is the fact that there's a

13   conspiracy, and what makes them unravel can be having an insider

14   that can actually help the government unravel that conspiracy.

15   And in many ways that's exactly what Mr. Allen did.  It's not

16   ignoring his role, we'll obviously get to that when we talk

17   about 3553(a) type factors, but it was a circumstance where

18   clearly Mr. Allen did the right thing by way of cooperation

19   beginning back in August of 2006.

20       Our motion also notes the cooperation with Judge Sullivan's

21   inquiry, which is a criminal probe, and I just want to address

22   that for a moment so the court knows the depth of our

23   considerations in this motion.  We had an addenda -- recently

24   unsealed second -- amended second addendum to the plea

25   agreement, forgive my French there.  And in that we basically

1    specified that Mr. Schuelke's probe would be a component of the

2    cooperation.  And I think that probably -- we think in some ways

3    the original plea letter covered that possibility, although it's

4    certainly an unusual circumstance, but we think it might have

5    been covered by the language of the initial plea but we agreed

6    with defense counsel's urging that we would modify to make that

7    specific.  So along with all of the traditional kind of

8    investigative and testimonial components that we're talking

9    about here we do include as a basis for our motion at least the

10   fact of cooperation with Mr. Schuelke representing mister --

11   Judge Sullivan's inquiry.  We are not here to weigh into the

12   depth or the honesty of that cooperation or anything in that

13   light, but we think it's appropriate, because there's at least a

14   criminal investigation taking place, to acknowledge that as a

15   component of our motion as well.

16       I would also specifically say that administrative

17   proceedings such as the OPR proceedings that are mentioned in

18   the defense sentencing memorandum would not be part of the

19   contemplated plea agreement or modified plea agreement.  So,

20   again, we don't dispute what counsel is likely going to say,

21   that there has been some measure of cooperation there, but we

22   don't believe that a collateral administrative proceeding should

23   be a component of our motion or necessarily even the court's

24   consideration on the depth or the scope of this 5K reduction.

25       We noted in our assessment that there have been guilty

pleas that have been secured through the assistance of Mr.
Allen. I think defense counsel mentions that Mr. Smith in some
part, and Mr. Smith has testified about this under oath, was
guided in his decision to cooperate with law enforcement by Mr.
Allen. There have been indictments of individuals that are
listed within our sentencing memorandum.

And I think I would just address one last thing about this
-- what we think the court should consider for the depth of this
5K reduction. In the court's order on the motion to continue,
if I remember correctly, Your Honor talked about the kind of
loose strands that were being asserted by the defense as still
being out there that would be a basis for a continuance. And I
know that included Mr. Schuelke and OPR. I believe it also
included the Weyhrauch case. And I would just suggest to the
court -- and the court ultimately said Rule 35 is an available
vehicle to address some of these things, not the administrative-
type bases but Weyhrauch's case. I would just suggest to the
court that it would be appropriate at this time to essentially
assume that Mr. Allen will continue to be available for further
proceedings. I mean, that is his plea agreement, there are
still both -- I guess there's at least still sticks there, maybe
not carrots anymore after a sentencing with a 5K reduction, but
I would submit to the court that in the Weyhrauch case we're
willing to basically assume that he will continue any necessary
cooperation in that matter as it winds its way through the

1  courts, and that in some ways if the court's comfortable with

2  it, we would suggest that could be included within the court's

3  determination of how much of a reduction to be -- to have here

4  today, rather than have either the amorphous ending or the

5  committal of a Rule 35 some day.

6  THE COURT:  Well, let me say I am prepared to take

7  that at face value.  Given the cooperation that Mr. Allen has

8  previously provided I don't doubt and I will assume that he will

9  continue to cooperate regarding Mr. Weyhrauch, which, after all,

10  but for certain unfortunate -- well, I won't say unfortunate,

11  but a decision by the Ninth Circuit with which I happen to

12  disagree, Mr. Weyhrauch would already have been tried.  All

13  right.

14  I would also add another minor comment.  I have accepted

15  the defense letter from Mr. Schuelke, and I am -- I have

16  considered that, or will consider that.  Thank you, sir.

17  MR. TRUSTY:  Thank you, Your Honor.

18  THE COURT:  And Mr. Bundy?

19  MR. BUNDY:  Your Honor, there's -- there's two things

20  that I want to be sure and highlight, and that is is that the

21  government -- that we believe absolutely and maintain

22  strenuously that Mr. Allen has always been forthright and

23  truthful in all ways with the government and with the court in

24  everything that he's done.

25  THE COURT:  I'm going to assume that for this

1    proceeding.  I think I'm already on record as having said as

2    much.

3          MR. BUNDY:  And secondly, then, just a brief

4    reference, and I don't know how -- what -- how much the court is

5    considering this today, the district's -- the U.S. Attorney's

6    Office policy on 5Ks.  I think that the government papers

7    misstated a little what that is.  It's my understanding that

8    what the policy is -- in this district is that when there is a

9    Rule 11(c)(1)(B) agreement in which there is a binding sentence

10   recommendation including a floor and a ceiling on a 5K, that

11   ordinarily in the plea agreement where there is a floor that the

12   court cannot go below or the government can withdraw from the

13   agreement, when there is such a floor agreement it will not be

14   lower than one-half of the low end of the guideline range unless

15   extraordinary cooperation occurs.  And there have been

16   instances, I understand, in which even the plea agreements

17   acknowledge extraordinary cooperation beyond the half.

18        But where there is a Rule 11(c)(1)(C) agreement in which

19   the court -- in which if there's a 5K the court is free to

20   determine the amount of the departure without any ability of the

21   defendant or the government to withdraw if the court doesn't

22   follow the departure.  Then that -- then that does -- any such

23   50% policy, there is no such policy about what the AUSA's going

24   to argue.

25          THE COURT:  I think you've mixed up (B) and (C).

1          MR. BUNDY:  Perhaps I have.  (c)(1)(C) --

2          THE COURT:  (c)(1)(C) is where the parties have an

3     agreement that the court either has to accept at face value or

4     reject.  (B) is the one where the parties have recommendations

5     but the court is free to ignore them.

6          MR. BUNDY:  Okay, I --

7          THE COURT:  It doesn't matter.  Your point -- I

8     understand your point.

9          MR. BUNDY:  Yes.  The -- and so I just wanted to point

10    that out, that in a case like this in this district, if this

11    were an AUSA arguing on behalf of the government he would not be

12    or she would not be constrained about what he or she would

13    recommend in terms of the amount of the departure.  They would

14    decide what that was going to be and then argue it.  There's no

15    policy that prevents them --

16         THE COURT:  Let me ask you --

17         MR. BUNDY:  -- or that constrains them.

18         THE COURT:  Let me ask you to address this.  One of

19    the things that occasionally comes out in a sentencing like this

20    where there is a 5K1 motion is that the cooperating defendant

21    has run great, grave personal risk for himself or his family.

22    In other words, this is an individual, in my hypothetical here,

23    who runs the risk of being assassinated or having his family

24    members killed.  I have literally had cases where one defendant

25    cooperated and another defendant refused and took a 10-year

1    mandatory minimum he was so scared.

2        Now, I have no reason to believe that that circumstance

3    pertains here, but I want to ask you if you have any information

4    that suggests that Mr. Allen was under any risk in cooperating.

5        MR. BUNDY:  Well, I don't -- I can say that I'm not

6    aware of any specific threat that's been made either in writing

7    or orally anywhere, but I can tell you that the level of

8    vilification of Mr. Allen has --

9        THE COURT:  Oh, I'll consider that, I understand that.

10   I'm just asking specifically.  I'm not aware of that, it doesn't

11   sound like any of the other defendants are the kind of people

12   who might be thinking about a hiring a hit man, but I just want

13   it made clear for the record that that's not a factor to be

14   considered.

15       MR. BUNDY:  It's not just whether the other defendants

16   might, it's whether some outraged member of the community --

17       THE COURT:  Or anybody else.

18       MR. BUNDY:  -- might for his own odd reasons decide

19   that he's going to take things into his own hands.  That's

20   always a possibility, particularly in a case like this where

21   emotions run so high.

22       THE COURT:  But it's the nature of the charges, not

23   the cooperation, that might elicit that.

24       MR. BUNDY:  Well, in this case because the cooperation

25   was against some people that are among some very popular, I

1    think that that increases that chance --

2            THE COURT:  Fair -- fair enough.

3            MR. BUNDY:  -- that a deranged person or an odd person

4    -- There's one other point I'd like to make about this

5    cooperation in particular, and that is, as the court knows from

6    the medical examinations, Dr. Restak and others, about Mr.

7    Allen's neurological deficits, it was much more difficult for

8    him to work through all of these gigantic amounts of

9    information, all the tapes that we were shown.  We certainly

10   weren't shown all of them or --

11           THE COURT:  Well, I agree with that.  I've seen Mr.

12   Allen testify and I think he testified truthfully, but I think

13   it was very difficult for him.

14           MR. BUNDY:  Correct, and so all of that, it was very,

15   very difficult to get through this -- this whole thing, much

16   more difficult than it would be for somebody who did not have --

17   not have had the accident that he had with the neurological

18   deficits.

19           THE COURT:  All right, thank you, sir.

20           MR. TRUSTY:  Your Honor, could I just -- just very

21   quick component --

22           THE COURT:  Yes.

23           MR. TRUSTY:  -- that the court -- And it's simply

24   because Your Honor asked about threat, I just feel it's

25   important for the court to understand.  From the government's

1  side of things we have no information suggesting there's any

2  sort of tangible or specific threat to Mr. Allen.  As --

3  Certainly as prosecutors and officers of the court if we had

4  such information we would let counsel know and at this juncture

5  we'd be letting the court know as well, whether it would be --

6          THE COURT:  I didn't mean to imply --

7          MR. TRUSTY:  -- in camera or not.

8          THE COURT:  -- anybody'd hidden anything from me.  I

9  guess I just wanted to make the point that that is one of the

10  things that often is used to establish exceptional cooperation.

11  And it appears -- it appears to be absent here except to the

12  extent of Mr. Bundy's comments.  All right, thank you very much.

13      All right, so the government has asked for an eight-level

14  reduction pursuant to guideline section 5K1.1.  The motion at

15  Docket 66 is granted as follows:  The reduction in the guideline

16  range of eight levels appears to me to be appropriate.  That, of

17  course, does not drive the sentence in its entirety but it's a

18  very significant consideration.

19      Now, in some federal -- in connection with some federal

20  crimes victims are entitled to speak at the sentencing hearing.

21  A common example arises in bank robbery cases.  In such cases

22  bank tellers often come to the sentencing proceeding and speak

23  regarding the sentence to be imposed on the person who robbed

24  the bank.  Unlike bank robbery, the crimes charged in the

25  indictment are crimes as to which there are no individual

victims.  Rather it is the public at large in Alaska and, at
least with respect to the Count 3, the public of the United
States who have suffered as a result of Mr. Allen's crimes.

     Mr. Ray Metcalfe, a former legislator, asked to speak as a
victim or victim spokesperson.  Because I find that Mr. Metcalfe
has not suffered any concrete and specific harm which was
directly and proximately caused by the crimes which are the
subject of this proceeding, he does not qualify to speak at this
hearing pursuant to 18 United States Code Section 3771(e).  This
decision is consistent with the reported case law on the issue.
See, for example, In re: Rendon-Galvis, reported at 562 F 3d 170
[sic], a Second Circuit decision from 2009, and In re: Antrobus,
a Tenth Circuit decision from 2008 reported at 519 F 3d 1123.
So Mr. Metcalfe will not be afforded a chance to speak.

     At this time I'd like to hear the lawyers' arguments for an
appropriate sentence.  These arguments should address the
factors specified in 18 United States Code Section 3553(a).
Care should also be taken to address the amount of the fine
which may be imposed for in an earlier written order I filed
some months ago I did advise the parties that I am seriously
considering imposition of the maximum fine allowed by law, which
is $750,000.  All right, with that, Mr. Bundy, I'll hear from
you and then I'll hear from Mr. Trusty and then I'll hear from
Mr. Allen.

          MR. BUNDY:  Your Honor, I'd like to introduce George

1    Terwilliger from White & Case who will be addressing the 3553.
2    But before we do I'd like to make sure that on the record we
3    have some of our questions about amounts that do not relate to
4    whether or not the factual basis should be used that were
5    contained in our sentencing memorandum, but I want to make sure
6    that I make a clear record, if that's agreeable.

7            THE COURT:  Well, you may make your record.  Now, what
8    is it?

9            MR. BUNDY:  It's on the amounts attributable to Mr.
10   Kohring, the -- there was $17,000 that the court assessed
11   against Mr. Kohring, which is what Mr. Kohring first asked of
12   Mr. Allen in that tape that was played in the Kohring trial and
13   the court found that Mr. Kohring was good for that $17,000
14   request as part of his sentencing.  But Mr. Allen never gave him
15   17,000, never loaned him 17,000, never suggested that he ask him
16   for 17,000.  In other words, Mr. Allen never did anything
17   illegal with regard to that $17,000 request from Mr. Kohring to
18   fix his medical bills and his MasterCard payment.  So we think
19   that it's improper that Mr. Allen be assessed that 17,000.

20           THE COURT:  Does it make any difference in terms of
21   the guideline calculation?

22           MR. BUNDY:  Not necessarily, no.

23           THE COURT:  I don't think that it does.  But your
24   point's on the record, I understand it.  And, by the way, I
25   agree with it.

1     MR. BUNDY:  And Mr. Kott likewise was assessed in the

2  court's finding which was adopted by the PSR $18,000 for a job

3  that he didn't get.  And we believe that that's improperly [sic]

4  because that came -- the discussion about how much Mr. Kott

5  would have made on that job and I believe that the amount that

6  the court finally concluded based on the Kott sentencing

7  proceeding came from Mr. Allen's testimony at the Kott trial.

8  And that clearly under the cooperation agreement is not

9  allowable to be used against Mr. Allen at sentencing regardless

10  of the proffer agreement or whatever.

11     The State Senator B likewise we contend that because much

12  of -- according to the Attorney General's opinion much if not

13  almost all of what he was paid for could be -- could be

14  considered legal because -- as a consultant who gives advice,

15  which is perfectly legal under the State Attorney General's

16  opinion that we cited, that all but about 10% of that should not

17  be considered as -- for the amount.

18     THE COURT:  Okay, well, that's the part that might

19  make a difference in the sentencing.  And I disagree with you.

20  I believe the factual basis is adequate support.  All right, Mr.

21  Terwilliger, good morning, sir, I'll hear from you.

22     MR. TERWILLIGER:  Good morning, Your Honor, thank you

23  for permitting me the privilege to appear in your courtroom on

24  this matter.

25     THE COURT:  Well, the truth is just about any lawyer

1    can appear here.

2         MR. TERWILLIGER:  It doesn't make it any less a

3    privilege.

4         THE COURT:  But in any event I appreciate that

5    comment.

6         MR. TERWILLIGER:  Your Honor, we are very grateful for

7    the court's obvious -- From the proceedings here this morning

8    and some of the proceedings that took place in the run-up to the

9    sentence, we're grateful for the careful consideration the court

10   has given to the matters that we've raised.  And while we

11   disagree -- As Your Honor indicated you may disagree on some

12   legal issues with others, while we disagree with some of the

13   court's rulings and we've had some legal disagreements with the

14   government, we are grateful for the process that we've had here

15   and Mr. Allen wishes to express that directly.  We're also

16   grateful for the professionalism which -- with which we've been

17   dealt with by our colleagues from the government.

18       I'm not going to go through all the factors we mention in

19   our sentencing memo under 3553(a), Your Honor, but I would like

20   to highlight a few as briefly as I can.  First of all, a couple

21   of important but housekeeping issues.  We would respectfully ask

22   Your Honor to request or make a recommendation requesting in the

23   judgment and commitment order that Mr. Allen serve his time at

24   one of two federal prison camps, either at Sheridan, Oregon, or

25   Tucson, Arizona.  Both of these are so that he can be near and

1    have the support of family without them having to travel too
2    great a distance.

3        We know how difficult it is to get down to the close
4    questions in determining what is an appropriate sentence in any
5    case, let alone a case of the complexity that this one has.  And
6    we would ask Your Honor to consider three factors in looking and
7    determining what would be an appropriate sentence here.  The
8    first of those, which has been alluded to earlier by Mr. Bundy
9    in terms of his cooperation, is Mr. Allen's age and his medical
10    condition.  The second is apply a sense -- or, senses of
11    proportionality and balance to the facts that go into sentencing
12    here, balancing what has been good in Mr. Allen's life which --
13    against that which has been not good and has violated the law.
14    And third, Your Honor, we would ask the court, as I know you
15    must always do, to apply a keen sense of justice to the
16    determination of sentence here, which inevitably includes the
17    kind of balance and proportionality that I'm referring to.

18        In terms of Mr. Allen's age and medical condition, he is 72
19    years old, as Your Honor knows, going on 73.  From both the PSR
20    and the government's recommendation -- Given his normal life
21    expectancy apart from a series of considerable and significant
22    medical problems he has, the recommendation in the PSR and the
23    government's recommendation in their sentencing memo would have
24    Mr. Allen spend half of the rest of his life in jail, or more.
25    His physical conditions and numerous problems that he has that

are detailed in the information Your Honor has, the medications

he takes and so forth, as well as the impaired cognitive

functions, which I very much appreciate Your Honor recognizing

in the comment that the court made earlier and to which Mr.

Bundy has referred to, the combination of those things, his

medical condition, his age, his impaired cognitive abilities,

are all going to make his service of time more difficult than it

would otherwise be did he not have those conditions.  And we ask

the court to take that into consideration in fashioning an

appropriate sentence here.

     In terms of applying a sense of proportionality and balance

I do want to speak for a few moments to Mr. Allen's personal

characteristics as shown by the presentence report and by the

record in some of the other proceedings that the court has been

involved in that give some insight to that.  I think it's fair

to say that Mr. Allen has created a record where one would have

to objectively conclude that he is an extremely hard-working,

dedicated, goal-oriented individual.  The company that he built

literally from nothing with little or no education is a

incredible accomplishment in and of itself.  He is the patriarch

of a very strong and unified and nuclear family, and much of

what he did was to build that.  He's also patriarchal in terms

of his employees whom he has always endeavored to take care of,

and even friends of employees.  The court does have, and I won't

belabor this because I know that you've looked at this, Judge,

1    but he has done some extraordinary things for people out of just

2    complete disinterested generosity.  And in fact that generosity

3    compliments his trait of being a hard-working and dedicated

4    individual.

5         What happened here in terms of his involvement that led him

6    to be here to be sentenced by Your Honor this morning I think

7    can be explained, but not excused, that he became focused on

8    this pipeline and the benefits that he saw that the pipeline and

9    that the certainty of the tax legislation would bring to Alaska

10   and to all Alaskans.  And as a result he allowed himself to turn

11   his inclination to generosity -- I'm echoing a little bit of

12   what Mr. Bundy was alluding to before -- into an effort to

13   increase his influence.  I'd note, Your Honor, in terms of

14   separating that which is illegal from that which people may

15   disagree with obviously, and I know Your Honor realizes this but

16   I think it's important, given a lot of what's been written about

17   this case, frankly, in the media, it's important to recognize

18   that while there may be a body of view that thinks the pipeline

19   was a bad idea or that oil exploration and gas exploration

20   generally are not good for Alaska, there are multiple reasonable

21   points of view on those issues.  Mr. Allen had one and pursuing

22   those legislative goals is an essential characteristic of

23   citizenship.  It's protected by the First Amendment.

24        Obviously what Mr. Allen did was allow his pursuit of those

25   legitimate goals to overcome what should have been better

1 judgment and his duty, his duty, his responsibility to obey the
2 law.  So there's no question that in doing what he did he did
3 cross the line, he recognizes that.  But I think when it comes
4 down to sentencing what has to happen is -- and this goes to my
5 point about balance, Judge -- that he has to -- all of that
6 wrong has to be measured by what he did when he was confronted
7 with that wrongdoing.  A decision he made, by the way, without,
8 as Your Honor knows, the benefit of counsel.  Mr. Bundy didn't
9 get involved in this matter 'til Mr. Allen had already made the
10 decision and crossed back over the line to do the right thing
11 for the right reasons here.

12     Public corruption is indeed an insidious wrong.  I spent 15
13 years in the Justice Department, many great years, like these
14 gentlemen, on the front lines of being a federal prosecutor and
15 as an appointed United States Attorney and the Deputy Attorney
16 General.  I understand very well the dangers of public
17 corruption.  And I was arrested, actually, in reading some of
18 Your Honor's comments about this matter in other contexts when
19 you said -- and if you don't mind my quoting you, Your Honor --
20 "Corruption has a way of corroding democracy and destroying
21 essentially all the values upon which our system depends."  No
22 one can disagree with that.

23     But when measuring that in terms of what Mr. Allen did, and
24 then what he did when confronted with this, I think it's fair to
25 say that in any experienced prosecutor's judgment almost all of

1  these cases where corruption is to really be ferreted out and
2  uprooted root and branch, removed, it takes people who are
3  deeply involved to cooperate. Now, presumably if the government
4  believed Mr. Allen was the worst offender, the most morally
5  reprehensible person in all of this, they wouldn't have made a
6  deal with him in order to get others. They would have made a
7  deal with somebody else to get him. Mr. Allen has cooperated
8  extensively in this case, as Mr. Trusty so in good faith has
9  represented to the court. Here the extensive investigation, the
10  surveillance and the electronic surveillance that took place
11  before Mr. Allen took place didn't get the job done. What got
12  the job done was Mr. Allen's cooperation.

13      Now, we recognize, Your Honor, that public opinion in this
14  matter is running very, very strong. And if what's been printed
15  in particularly the Anchorage paper is accurate, public opinion
16  is running very strong against Mr. Allen personally here. The
17  court has received a number of letters indicating a very strong
18  sentiment of public opinion against Mr. Allen. I'm struck when
19  doing that with what the federal system needs in a case like
20  this. From the very first days of federal law enforcement on
21  the western frontiers of the United States the federal
22  government, federal law enforcement and federal courts have
23  always stood as a bulwark and a barrier against runaway public
24  opinion and injustice. A sentence with balance and
25  proportionality is in fact doing justice in this case.

1    I think probably the most difficult task and most awesome

2    responsibility a judge can face is in sentencing another human

3    being, particularly in circumstances where community sentiment

4    runs high.  We ask the court to strike that balance that

5    recognizes that Bill has paid a great price already for what he

6    has done, that he will suffer greatly by being incarcerated as

7    we know he will be.  We ask you to temper the punishment that

8    you mete out in this case with recognition of all that he has

9    done to try to make this right since he did wrong.  Thank you,

10   Your Honor.

11           THE COURT:  Thank you, Mr. Terwilliger.  Mr. Trusty.

12           MR. TRUSTY:  Your Honor, thank you.  To start with the

13   house -- what was referred to as housekeeping, in terms of the

14   placement of Mr. Allen within the Bureau of Prisons, I would

15   just, I suppose, largely defer to the court in terms of a

16   recommendation.  It's my understanding that the federal

17   institutions very clearly assess the location of the penal

18   institution compared to family members to facilitate visits --

19           THE COURT:  Let me simply say that I've never turned

20   down a recommendation to be housed somewhere near family.  I

21   think that's important.

22           MR. TRUSTY:  Right.  My only suggestion is most

23   likely, and, I guess, guiding my neutrality on that is the fact

24   that BOP will consider it with or without a recommendation.  But

25   no objection to the recommendation, I suppose.

1        Your Honor, I think that Mr. Terwilliger does put his
2    finger on kind of a fundamental issue here that reminds me how
3    good it is not to be a judge sometimes, which is balancing
4    wildly competing interests and trying to strike a balance that
5    metes out justice.  I don't envy the court, I think that is a
6    challenge in many circumstances, and it's a particular challenge
7    here.  I think Mr. Allen by all accounts is a -- can be a very
8    polarizing figure, maybe a polarized figure himself in terms of
9    his conduct over his life.  We are not at all disputing any of
10   the letters that the court has reviewed, we're not challenging
11   their validity.  There is a picture of a man that loves family,
12   that supports friends and family, that has extraordinary acts of
13   charity within him.  And so I don't dispute that that is at
14   least a part of Bill Allen and his, again, probably very
15   admirable upbringing as a hardscrabble person that rose from
16   literally nothing to positions of great influence, although
17   again misused by the end of the day.
18       Balancing that kind of charitable or admirable component of
19   Mr. Allen were actions that were committed over a period of
20   years that were very destructive.  And I think the court has
21   been and will be more eloquent than me in describing just how
22   much of a swath of harm was created and, frankly, is created by
23   Mr. Allen's corruption of others within the political process.
24   He has tarnished political institutions in a way that is very
25   visible and that cries out for specific deterrence, general

1    deterrence and punishment under 3553(a).

2        I believe the tendency when we have -- at least the

3    tendency within myself when it comes to these types of competing

4    interests is to -- is to in some ways assume the truth lies

5    somewhere in between when you're characterizing a person.  I

6    don't think that's really a particularly accurate or helpful

7    saying in this case.  I think the truth is embracing both

8    extremes when it comes to Mr. Allen.  It's not that we're

9    misunderstanding the charitable nature of some of his conduct

10   over the years, it's not that we're misunderstanding the depth

11   of harm he's created by engaging in corruption as a leader of

12   it, it's really both.  And, again, if you add in yet another

13   factor, which is the cooperation to the government, which I

14   guess falls closer to the former category, it's a difficult

15   balance.  And I'm not sure that it's easy or that reasonable

16   minds can't disagree within the area that we are.

17       I do think it's important to acknowledge, and I'll have a

18   few comments about this, that cooperation as -- that drove the

19   guidelines down to where we are.  I think it's been fairly

20   considered in terms of creating the guideline range where we

21   are.  But it was important and extensive, but there's also,

22   again, the conflicting notion of the need for punishment,

23   because he was in fact the center of this wheel with spokes in

24   many directions.

25       Your Honor, I think I was going to use the phrase that this

1  corruption scheme was toxic but it did remind me in hearing Your

2  Honor quoted from, I think, the Kott sentencing -- I think it

3  was Kott -- that it was corrosive.  I mean, whichever word we

4  want to use, I think it's dead on that these moments of graft,

5  these moments of corruption were very devastating to Alaska in

6  general, and to the political institutions.  And this harm is

7  substantial and lasting and we would submit to the court that

8  that obviously needs to be a part of the equation here today.

9       I've heard a lot about Mr. Allen's motivations, I think

10  it's in the sentencing memo as well, that this was something

11  where he essentially didn't intend evil, he was intending to

12  push something forward that he thought was good for Alaska or

13  good for the country as a whole.  But then again, pursuing that

14  became corrupt.  I mean, the way he pursued it was in fact

15  corrupt.  And I think there's an element of truth to that.  It's

16  incomplete, but I think there's an element of truth to that.  I

17  think that in fact Mr. Allen could justify in his mind his

18  corruption by saying it's good for my state, it's good for my

19  people, it's good for my country, but ultimately, even if that's

20  in play here, even if that's part of the motivation for the

21  series of corrupt acts, bribery involves flat-out greed.  I

22  mean, this is a circumstance where it might be a handy

23  justification to say I'm doing it for all, but ultimately

24  bribery involves greed.  The recipients of the bribe clearly

25  trade in their honor for a pittance.  I mean, that's -- I think

that's a perfect summary of some of the recorded conversations

that the court is well aware of in this case. I mean,

absolutely trading in their honor for hundreds and sometimes

thousands of dollars.

The briber, the person that's actually handing out the

money or the benefits or the promises, that's a person that's

decided they want a profit regardless of the harm. I mean, Mr.

Allen may not have gone far educationally, but in the school of

wisdom from life he's learned a lot, he knows a lot, he knows

better than to engage in the corrupt means that he engaged and

he made that decision. Again, not as a one-time kind of

momentary lapse, but as a sustained, organized, well-thought-out

decision to get what he wanted for Veco and for oil exec -- or,

oil companies beyond Veco and, again, in some level for Alaskans

as well. But he wanted to pursue that through a corrupt

process.

Your Honor, there were -- there were years of infecting the

political process with corruption, and obviously there should be

an accounting today for the harm that he has caused. We're not

at all blind to, and again we think the guidelines have

accurately reflected this now, that there was extensive and

immediate cooperation, that conspiracy investigations frequently

require that type of cooperation to unfold the full scope of

that conspiracy. And of course the system obviously

contemplates the cooperation that has taken place here under

1   guideline 5K1.1, and I suppose 3553(e) as well, that cooperation

2   is something that this court should consider both in terms of

3   the guidelines and I think more broadly within 3553.

4       Your Honor, we don't ignore the government's position,

5   which was a recommendation of 46 months before the final

6   guideline calculations here.  It's a calculation that we believe

7   does not ignore the benefit of all of that cooperation, the

8   dozens of debriefings, the trial testimony, the consensual

9   recordings, et cetera, but it also strikes that balance in terms

10  of a significant need here for punishment, for specific

11  deterrence and for general deterrence.  And we know that, if I

12  calculated correctly, our guideline range as adopted by this

13  court today is now 33 to 41 months.  Our recommendation said 46

14  months.  Of course it was again in the context of a plea

15  agreement where guidelines hadn't been finally determined.  I

16  think we actually quite intentionally used the language in the

17  vicinity of 46 months at one point in our sentencing memo, and I

18  think we stand by that notion.  Whether it's 41 months, to put

19  it within the applicable guideline range, or something in that

20  immediate vicinity, we think it's appropriate.  Again, a

21  difficult balance, we're deferential to the court in that

22  regard, but we'd submit that if we're going to be within the

23  guidelines that a 41-month sentence would be appropriate.

24      We also think that the ability to pay is abundantly clear

25  here.  Obviously Probation Officer Brewer's calculations made it

1    clear that, really, any fine that's within the statutory limit

2    is one that could be in play here, and we think that the maximum

3    fine, the actually consecutive fines per count of $250,000 per

4    count would make sense, that $750,000 is an appropriate message

5    under the factors Your Honor considers under 3553.  We

6    understand that in terms of fine guidelines, nonbinding fine

7    guidelines, that it's in excess of that, but we think it's an

8    appropriate component and an appropriate part of the deterrence

9    package that the court has to consider under 3553 to in fact

10   impose that maximum fine.

11        So, Your Honor, unless the court has any specific questions

12   of the government, we believe that under all of the tangled

13   circumstances of Mr. Allen's history and his conduct and the

14   need to reflect justice in this sentence, that imprisonment in

15   the vicinity of 41 months, again originally recommended 46, a

16   maximum fine, and three years of supervised release would all be

17   appropriate.

18             THE COURT:  Thank you, Mr. Trusty.  Mr. Allen, you

19   have a right to speak.  If you wish to speak, now is the time.

20             THE DEFENDANT:  Okay, I'd like to.

21             THE COURT:  You may speak at the podium if you wish.

22             THE DEFENDANT:  All right, thank you, Your Honor, for

23   allowing where I can really talk.  I can't talk as fast as these

24   guys can, but I'll try it.

25             THE COURT:  Most of us cannot do that.

1          MR. TRUSTY:  Apologies.

2          THE COURT:  Take your time, Mr. Allen.  I know it's

3     difficult, so take your time.

4          THE DEFENDANT:  Thank you.  I started -- I went to

5     Alaska in 1968, I was a -- it was a good -- the timing was

6     great.  They needed people like me to develop the resources.  I

7     started out in Cook Inlet.  An oil company wanted me to go in

8     business and I did.  I went -- I was really -- I was really

9     wanting to get the gas pipe -- the oil pipeline.  I didn't know

10    anything about politics by then -- by that time, but we -- I

11    could see that we weren't going to get the pipeline for the oil,

12    the oil line.  So there was a big boom going in the North Sea,

13    so I went over there, I built up a pretty good company, we

14    probably had 1,000 people.  The same thing on platforms, I was

15    really knew -- I knew a lot about platforms because of Cook

16    Inlet.

17        So it came along pretty good.  I also had Veco, and I tried

18    to -- it was really hard to go from take care of Veco here in

19    Alaska and the company that I made in the North Sea.  It was a

20    tough time doing both of it.  And then I think we got the

21    pipeline for the oil -- the oil pipeline, I think it was about

22    '75, and so I started trying to sell my part of the company in

23    the North Sea.  I was successful.  I took that money back to

24    Alaska and I put the slo -- the money on the Slope.  I went up

25    there and done it myself.  It took me a year to get all the camp

1  and the shops done, but it was successful.  So I -- both of the

2  -- both the timing was great.

3       When I seen that we were going to produce about two million

4  dollar -- two million barrels a day I thought, boy, the --

5  Alaska really needs to make sure that they keep that.  I think

6  that time it was the -- Prudhoe was producing, like I say, about

7  two million, and that was about 20% of our oil that they use in

8  the Lower 48.  And from that it really -- the -- Alaska really

9  got -- it was a good deal for Alaska because look at all these

10  buildings and libraries and stuff that we had that the -- that

11  arose.

12       And when I -- when I come up to Alaska in '68 Alaska liked

13  oil.  They thought it was great.  But there was some of the

14  media, particularly with the newspaper, didn't like oil, for

15  some reason, and I don't understand why, I still don't.  I --

16  when I got and decided that I -- if I could help with oil, I

17  hired a lobbyist.  And he said the best thing you could do is --

18  is make some -- get some fundraisers for the same guy -- same

19  people that really have the same mind that I got, and that's to

20  try to produce, protect oil and make sure that it's -- that it's

21  -- they get their part of it, too, you know, and the state.  And

22  we had a pretty good tax deal.  And it was -- it was -- it was

23  really balanced, in my opinion.

24       But anyway, lots of fundraisers.  We -- we did get a lot of

25  good people as legislators down in Juneau.  About -- after that

T M Transcribing . 1980 Commodore Drive . Anchorage, Alaska  99507 . (907) 277-8591

1    time, the lobbyist and I parted ways and so I got more

2    personally involved into the political process.  We needed those

3    voices and that's the reason that I bought The Anchorage Times.

4    About that time I hired Rick Smith to help with the fundraisers,

5    he was really good at that.  It took about -- a little over two

6    years and it was a big war between The Anchorage Times and the

7    Daily News.  And the McClatchys had a deeper pocket than I had,

8    so I sold to them but I kept the editorial page.  And I think

9    that -- I had it for 15 years.  And I think it was a pretty good

10   balance between what they thought and what the conservative

11   people did.

12        When Murkowski was elected I think Murkowski done a good

13   job, he really did.  He was a little bit too hard-headed and

14   shouldn't have wanted that jet -- that jet, but other than that

15   he -- I think he done a good job.  What he done was he took the

16   three producers together and got them together and -- and they

17   -- that's the first time they've ever really got together on

18   something.  And so I thought, man, I can really help.  All they

19   wanted was a clarity on the oil tax and they would build the --

20   the natural gas pipeline, which we really need.  Also they would

21   put more money in oilfields like West Sag and the heavy oil that

22   we got.  We got a big -- west -- slag -- west slag -- west --

23   The oil that I'm trying to say, West Sag.  It's almost as many

24   oil as Prudhoe's got, but it's cold and it's hard to produce.

25   So if we had a good climate between the three big producers and

1    the State, it would be a better deal.  They need to be more like

2    marriage than anything else.  And it got real close, it really

3    did.  And probably trying to push it too hard, that's when I

4    went over the line.  I shouldn't have done that, but I did.

5        When -- when they nailed me in 206, the FBI, it was the

6    30th of August of 1906 [sic] and they give me a tape that really

7    embarrassed me.  I can't talk anyway, and when they -- when we

8    were -- when they were taping it, hell, I could tell I was half

9    drunk and it didn't -- I didn't like what I looked at, looked at

10   myself.  So I made two decisions.  I was going to do the right

11   thing, because I did do it too wrong.  I was trying to make it

12   right.  And I quit drinking, I haven't had a drop of alcohol

13   since August 30th in 206.  And I'm not a alcoholic, it's just

14   that you do a lot of drinking down there in Juneau.  And that's

15   the stupidest thing you can do with me or with any legislators

16   or anything else, because your reasoning is not as good as it

17   should be.

18       So I'd like to apologize to you, to the people here in

19   Alaska.  Instead of me really helping them, I've pushed them

20   down, really.  But I thought I was doing, but I -- I pushed --

21   again, I pushed it too -- I went over the line too far.

22       I worked with the government for two years, and it was like

23   the -- It was like -- it was a job.  We probably done five to

24   seven days a week trying to get ready for all these trials.  And

25   -- but -- and it was -- that's all -- I couldn't have had a full

1   time because I -- what I had to do to help them. I also -- it

2   was hard on a lot of people that was really my friends. They're

3   not now.

4       So, Your Honor, I respectably, go ahead and -- and sentence

5   me, but kind of remember that I've try -- I've done some good.

6   I'd like to thank you.

7       THE COURT: Thank you, Mr. Allen. The lawyers and

8   some of you in the auditorium who've attended previous

9   sentencings in this court know that I must consider a variety of

10  factors in selecting a sentence for any defendant who comes

11  before this court. They are set out in the statute which has

12  been codified at Section 3553(a) of Title 18 of the United

13  States Code. Congress chose to list them in separate numbered

14  paragraphs.

15      The first paragraph refers to the nature and circumstances

16  of the offense and the history and characteristics of the

17  defendant. As some of you may have heard me say before, that's

18  not one factor, that's really two. And as is often the case,

19  here those factors point in decidedly different directions for

20  the most part. The nature and circumstances of this offense can

21  hardly be overstated. As I have said before, the effect of

22  corruption on our political process threatens all of us and all

23  of our goals and ideals. A democracy doesn't work when it is

24  corrupt. It doesn't take much to look around the world and see

25  places that claim to be democracies but don't function as

1   democracies precisely because they are corrupt.  We're blessed
2   to live in a country, one of only a relatively small number,
3   where that isn't true.  We enjoy the benefits of a true
4   democracy.  Now, from time to time that democracy is threatened,
5   as it was here.  Mr. Allen's behavior and that of those who
6   associated with him indeed threatens the very foundation of our
7   democracy.  So this is a very serious offense.

8       The history and characteristics of the defendant largely
9   point in another direction.  Let me first, however, note that
10  they are not entirely commendable.  The participation in the
11  campaign contribution scheme back in the '80s gives us some
12  insight into the relatively early point in his career when Mr.
13  Allen recognized the vulnerability of the political process to
14  the injection of money.  Our political process requires that
15  those who seek elective office raise money and spend it in order
16  to get elected, in order to get their message across.  In my own
17  view, that's sort of a necessary evil.  We certainly want people
18  to be able to speak and for the community at large to be able to
19  hear them.  But to do that in today's world requires the
20  expenditure of large sums of money because people are no longer
21  reached, at least in statewide and national campaigns, by the
22  politician going door to door so much as they're reached by
23  expensive advertising campaigns.

24      On the other hand, as has been pointed out by Mr.
25  Terwilliger and is clear in the briefing filed by Mr. Bundy and

1    Mr. Terwilliger and as is evident in some of the comments that
2    Mr. Allen has made and is particularly clear in the letters of
3    support that have been submitted by his friends and family, he
4    is an individual who has commendable attributes.  He is a person
5    who is generous to friends and family, he is a person who has
6    charitable instincts upon which he has acted.  He has done a lot
7    of good in the community.

8        So this particular factor that I have to consider is, as
9    usual, a difficult one to assess.  I think all the -- I think
10   when you balance the nature and circumstances of the offense and
11   history and characteristics of the defendant, that a sentence,
12   not yet taking into account the substantial assistance that Mr.
13   Allen has provided, somewhere within the guideline range, or
14   perhaps slightly higher, would be appropriate.

15       A sentence that I impose is one which, according to
16   Congress, must reflect the seriousness of the offense, promote
17   respect for the law and provide just punishment, and account for
18   education, training, medical and other correctional needs that
19   any defendant may have.  That's a mouthful for one factor.  But
20   when we parse it we see that the seriousness of the offense here
21   is something that would require a relatively stiff sentence,
22   something on the order of what the guidelines suggest would
23   certainly be appropriate.  Similarly, in order to promote
24   respect for the law, a sentence that large or larger would be
25   appropriate.  In promoting respect for the law and recognizing

the seriousness of the offense, I think we result -- the result
is a just punishment. Mr. Allen does have certain medical needs
and those can be met during any period of incarceration, and
that matter, I don't think, really needs to delay us further.

     The sentence needs to deter further criminal conduct by the
defendant. I think here the defendant is not likely to engage
in further criminal conduct. I think he has learned his lesson.
Mr. Allen may not have had much of an education but I consider
him to be an extremely smart person. He didn't get where he is
without intellectual prowess, whether it was educated or not.

     I need to deter criminal conduct by others. Frankly, I
would think anyone in Mr. Allen's position, or in a similar
position, who knew that he was going to spend several years in
prison would think twice before engaging in the kind of activity
in which he did engage, particularly since conspiracy nearly --
conspiracies nearly always unravel. If Mr. Allen hadn't
cooperated, if Mr. Smith hadn't cooperated, certainly somebody
else would have. So it's a really stupid kind of crime to
commit because you're putting your future in the hands of other
people and those other people are, by definition, criminals.
The kinds of sentences available have to be considered and the
kinds of sentence available here are limited to a period of
incarceration followed by supervised release.

     Next I have to consider the advisory guidelines and policy
statements published by the United States Sentencing Commission.

T M Transcribing . 1980 Commodore Drive . Anchorage, Alaska  99507 . (907) 277-8591

1  I have determined that the level here, after taking into account

2  the motion for substantial assistance, is a Level 20, and Mr.

3  Allen falls in Criminal History Category I, so the guideline

4  range which is indicated here is from 33 to 41 months.

5      I'm directed to avoid unwarranted sentencing disparities.

6  Here many in the public will compare whatever sentence I impose

7  on Mr. Allen to sentences imposed on people like Pete Kott and

8  Vic Kohring.  But in making those comparisons one needs to take

9  note of some significant differences.  Mr. Allen has cooperated.

10  He began cooperating the very day he learned that he was a

11  subject of the investigation.  Mr. Kohring and Mr. Kott had the

12  opportunity to do that.  They chose not to do that.  More than

13  that, they not only refused to cooperate, they refused to accept

14  responsibility for their crimes.  Mr. Allen forthrightly

15  accepted responsibility for his crime.  Mr. Kott even took the

16  stand and testified and he gave testimony that the jury

17  obviously didn't believe was true.  So it really is not an

18  appropriate comparison.  When you look to avoid unwarranted

19  sentencing disparities, you have to consider the nature of the

20  crime and the nature of the cooperation which was presented

21  here.

22      With respect to that cooperation, I think it's important to

23  point out that the -- what Mr. Allen did is very substantial.

24  It's rare indeed for the government to recommend a sentence less

25  than half of the low end of the otherwise applicable guideline

range, but that was done here.  Indeed, the only factor I can

think of that would've made Mr. Allen's cooperation more

impressive is one which simply didn't come to exist here.  If

there had been threats against his life or that of his loved

ones, his cooperation would indeed have been truly outstanding.

But the point is he did what he could with what he had.

       And the system is designed to give benefits to those who do

that.  As Mr. Trusty has said, conspiracies unravel when someone

inside the conspiracy decides to cooperate.  In this instance it

was the fellow at the top of the pyramid who decided to

cooperate and some of the others, rather foolishly, I think,

decided not to.

       I have to consider restitution to victims of the crime.

There are no specific individual victims of this crime.  The

real victims are, in effect, everyone in this room with the

possible exception of the lawyers who are from Washington, D.C.

But the -- even they are affected, albeit indirectly, by the --

by Count 3, which was Internal Revenue Service count.

       I'm directed by Congress to impose a sentence that is

sufficient but no greater than necessary.  That's the final

consideration.  Mr. Terwilliger has spoken at some length about

Mr. Allen's health circumstances, and these indeed are something

that I am going to consider and do consider in fashioning an

appropriate sentence.

       When I take all of that into account it seems to me that in

order to achieve all the objectives that Congress has laid out
and to take into proper account the cooperation, the very
substantial cooperation that Mr. Allen has provided, that a
sentence of three years in prison is required.  I do believe
that a sentence of any less than that would be insufficient to
achieve the goals required.  I think a sentence any greater than
that would not adequately take into account Mr. Allen's
cooperation nor would it adequately take into account his
personal circumstances regarding his health, and the difficulty
he is almost sure to have wherever he is incarcerated.

Sometimes people make light of the fact that institutions
within the Bureau of Prisons system designed for people who
present low risks of escape or danger to others aren't as hard
as those institutions where the inmates are in fact dangerous.
But of course it would be an unnecessary use of funds to make
them as hard because the people who are there are not going to
pose threats of escape or danger.  But nevertheless it is
punishment, it is prison.  Those people are kept in a place they
can't leave, they're there 24 hours a day.  Their daily regimen
is directed not by them but by others.  It is in fact a
miserable position in which to find yourself.  And Mr. Allen
will find himself in that position.

Let me make a couple of comments about the fine.  The crime
that was committed here was committed for more than one reason.
I don't doubt what Mr. Allen said about his belief that what he

1  was doing was in the best interests of his fellow citizens.  But
2  so too do the people who speak out writing letters to the editor
3  or running for the legislature or the school board or anything
4  else.  Those people also do what they do because they think it's
5  in the best interests of the people.  But they don't commit
6  crimes.  Mr. Allen did commit a crime and that crime involved a
7  lot of money.  Whether Mr. Allen and those who agree with him
8  are right or wrong in terms of public policy, the fact is that
9  the position he advocated would have had the effect of moving
10 hundreds of millions if not billions of dollars as between the
11 people of the state and the oil companies.  If those hundreds of
12 millions or billions of dollars had been left with the oil
13 companies, then there is no doubt that Mr. Allen's company,
14 Veco, would have experienced a substantial portion of that money
15 in the form of contracts with those very oil companies.  So Mr.
16 Allen was playing a game which involved in all probability tens
17 if not hundreds of millions of dollars of revenue for his
18 company.  So a large fine is clearly appropriate to reflect the
19 financial nature of the crime that was committed.

20     Were I able to impose a larger fine, I would, but the
21 statutory maximum fine in this case is $750,000 and I am going
22 to impose it.

23     So let me give you my sentence.  Pursuant to the Sentencing
24 Reform Act of 1984, and considering the factors found in 18
25 United States Code Section 3553(a), it is the judgment of the

court that the defendant, Bill J. Allen, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 36 months consisting of 36 months on Count 1, 36 months on Count 2, and 36 months on Count 3, these terms to be served consecutively. Upon release from imprisonment defendant shall be placed on supervised release for a term of three years on Counts 1, 2 and 3, to be served concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons defendant shall report in person to the probation office in the district to which he is released. While on supervised release defendant shall not commit another federal, state or local crime, shall not possess a firearm or illegal controlled substance, and shall comply with the standard conditions included in the court's judgment.

The otherwise mandatory condition of supervised release set forth in 18 United States Code Section 3583(d) requiring the defendant to submit to drug testing is suspended because there is little or no risk of future substance abuse by this defendant.

The defendant shall also comply with the following special conditions: One, as required by statute, defendant shall cooperate in the collection of a DNA sample from the defendant as directed by the Bureau of Prisons prior to release or by the probation officer upon release if it has not been collected while incarcerated.

1     Two, defendant shall submit to a warrantless search of

2     person, residence, vehicle, personal effects or place of

3     employment and other property by a federal probation or pretrial

4     services officer or other law enforcement officer based upon

5     reasonable suspicion of contraband or a violation of a condition

6     of supervision.  Failure to submit to a search may be grounds

7     for revocation.

8     Three, until such time as the fine and interest is paid

9     defendant shall provide the probation officer access to any

10    requested financial information.

11    Four, defendant shall not possess a firearm, destructive

12    device or other weapon.

13    I find that Mr. Allen is able to pay a fine.  It is

14    therefore further ordered that the defendant shall pay to the

15    United States a fine of $750,000 which is due to be paid in full

16    immediately.  Any unpaid amount is to be paid during the period

17    of incarceration at a rate of 50% of his income in the custody

18    of the Bureau of Prisons and at the same rate after release if

19    there is any unpaid balance at that time.  Interest on the fine

20    will not be waived.

21    It is further ordered that the defendant shall pay the

22    United States a special assessment of $300 which is due to be

23    paid immediately to the Clerk of Court.  It is further ordered

24    that the defendant shall surrender himself at the institution

25    designated by the Bureau of Prisons upon notification of

1    designation by the U.S. Pretrial Services office.  Conditions of

2    release shall continue until the defendant actually surrenders.

3         Mr. Allen, this means that the conditions earlier set

4    remain in effect.  And if you violate them you'll be arrested,

5    do you understand that?

6              THE DEFENDANT:  Well, I can't hear you, sir, I'm

7    sorry.

8              THE COURT:  Okay, you're going to report to an

9    institution to serve your sentence, but you won't do that until

10   you're told where you have to report, do you understand that?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Okay, now, between now and then the

13   conditions that were set all those years ago on your release,

14   they remain in effect, so you have to abide by them.  Do you

15   understand that?

16             THE DEFENDANT:  Yes.

17             THE COURT:  All right.

18             THE CLERK:  Judge.

19        (Court confers with clerk)

20             THE COURT:  Well, the clerk advises me I made a

21   misstatement.  I didn't think I did, but the terms of

22   imprisonment are concurrent, not consecutive.  I may have

23   misspoke.  If I did, it makes a big difference to Mr. Allen --

24             THE DEFENDANT:  Yes.

25             THE COURT:  -- and a big difference to me because

1  that's not my intent. I meant concurrent, meaning at the same

2  time. Total of 36 months. Thank you, Madam Clerk. Similarly,

3  the terms of -- the terms of supervised release are concurrent,

4  not consecutive. It is my recommendation to the Bureau of

5  Prisons that Mr. Allen be placed at a facility in Sheridan,

6  Oregon, or in Tucson, Arizona, so that he may be near his

7  family.

8         All right, is there anything further that we need to do

9  today before I advise Mr. Allen of his limited rights on appeal?

10              MR. BUNDY: No, Your Honor.

11              MR. TRUSTY: I don't believe so, Your Honor.

12              MR. BUNDY: No, Your Honor.

13              THE COURT: Mr. Allen, even though you pled guilty you

14  would ordinarily have a right to appeal your sentence. However,

15  in your plea agreement you waived your right to appeal. That

16  kind of waiver is ordinarily enforceable. If for some reason

17  you think it's not enforceable, then you can take an appeal.

18  But if you want to take an appeal you have to do so within 10

19  days of the time that sentence is imposed. I know you can

20  afford to take an appeal so I'm not going to advise you

21  regarding how you go about taking an appeal in forma pauperis.

22  You should discuss this matter with your lawyers if you have any

23  questions.

24         All right, if there's nothing further, then, we'll adjourn

25  this matter. We're late for the next one. And I'll take a

1   brief recess from the bench.

2          THE CLERK:  All rise.  This matter's now adjourned,

3   this court now stands in recess until the 10:00 a.m. matter.

4          (Proceedings adjourned at 10:11:35 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2          I, Teresa E. Mielke, court approved transcriber, certify

3     that the foregoing is a correct transcript from the official

4     digital sound recording of the proceedings in the above-entitled

5     matter.

6

7     ___/s/ Teresa E. Mielke_____

8          Teresa E. Mielke                    October 31, 2009

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

T M Transcribing . 1980 Commodore Drive . Anchorage, Alaska  99507 . (907) 277-8591